**LATHAM & WATKINS LLP**
  Marvin S. Putnam (Bar No. 212839)
   *marvin.putnam@lw.com*
  Laura R. Washington (Bar No. 266775)
   *laura.washington@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Telephone:  +1.424.653.5500
Facsimile:  +1.424.653.5501

*Attorneys for Defendants*
Netflix, Inc., and
Netflix Worldwide Entertainment, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIONA HARVEY,<br><br>   Plaintiff,<br><br>  v.<br><br>NETFLIX, INC., and NETFLIX WORLDWIDE ENTERTAINMENT, LLC,<br><br>   Defendants. | Case No. 2:24-cv-04744-RGK-AJR<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE**<br><br>Date:  September 3, 2024<br>Time:  9:00 a.m.<br>Place:  Courtroom 850<br><br>Hon. R. Gary Klausner |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION.................................................................................1

II.   STATEMENT OF FACTS...................................................................3

     A.    Gadd. ..........................................................................................3

     B.    Netflix. .......................................................................................3

     C.    Harvey. ......................................................................................3

     D.    The Series...................................................................................5

     E.    Harvey's Allegations. ................................................................6

III.  LEGAL STANDARD. .........................................................................7

IV.  THE COURT SHOULD GRANT NETFLIX'S MOTION. ..........................8

     A.    Harvey's Claims Arise From Protected Activity................................8

          1.    The Claims Arise Out of Conduct in Furtherance
               of Speech. ...................................................................8

          2.    The Speech Is Connected with an Issue of Public
               Interest. ......................................................................8

     B.    Harvey's Claims Are Meritless.....................................................9

          1.    Harvey Cannot Show Netflix Made Provably False
               Statements of Fact *About Her*.....................................9

                   a.    No Reasonable Viewer Could Understand
                       The Series As Making Factual Statements
                       About Harvey. .................................................10

                   b.    The Context Demonstrates the Alleged
                       Statements Are Not Factual...........................12

          2.    The Alleged Defamatory Statements Are
                Substantially True.....................................................13

           3.    Alleged Defamatory Statements Are Non-
               Actionable Opinion...................................................14

i

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

4.      Harvey Cannot Establish Actual Malice. ................................ 15

C.      Harvey's Other Claims Should Also Be Stricken ............................ 17

V.      CONCLUSION. ........................................................................ 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Aguilar v. Universal City Studios, Inc.*,
174 Cal. App. 3d 384 (1985) ........................................................................ 10, 11

*Baral v. Schnitt*,
1 Cal. 5th 376 (2016) ............................................................................................. 7

*Beilenson v. Super. Ct.*,
44 Cal. App. 4th 944 (1996) ............................................................................... 16

*Brodeur v. Atlas Enter., Inc.*,
248 Cal. App. 4th 665 (2016) .................................................................. 8, 12, 13

*Christian Rsch. Inst. v. Alnor*,
148 Cal. App. 4th 71 (2007) ............................................................................... 16

*Cross v. Cooper*,
197 Cal. App. 4th 357 (2011) ............................................................................... 8

*De Havilland v. FX Networks, LLC*,
21 Cal. App. 5th 845 (2018) ............................................................... 8, 10, 15, 16

*Denney v. Lawrence*,
22 Cal. App. 4th 927 (1994) ............................................................................... 15

*Dworkin v. Hustler Magazine, Inc.*,
668 F. Supp. 1408 (C.D. Cal. 1987) ................................................................... 16

*Dworkin v. Hustler Magazine, Inc.*,
867 F.2d 1188 (9th Cir. 1989) ............................................................................ 16

*Eliott v. Lions Gate Ent. Corp.*,
639 F. Supp. 3d 1012 (C.D. Cal. 2022) ...................................................... 5, 13, 14

*Ferlauto v. Hamsher*,
74 Cal. App. 4th 1394 (1999) ........................................................................ 9, 15

*Films of Distinction, Inc. v. Allegro Film Prods., Inc.*,
12 F. Supp. 2d 1068 (C.D. Cal. 1998) ............................................................... 13

iii

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

*Gilbert v. Sykes*,
    147 Cal. App. 4th 13 (2007) ................................................................................. 17

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*,
    742 F.3d 414 (9th Cir. 2014) ............................................................................... 7

*Heller v. NBC Universal, Inc.*,
    2016 WL 6583048 (C.D. Cal. June 29, 2016) ............................................... 8, 15

*Int'l Un. Of Operating Eng'n, Local 39 v. Macy's, Inc.*,
    83 Cal. App. 5th 985 (2022) ................................................................................ 7

*Jackson v. Mayweather*,
    10 Cal. App. 5th 1240 (2017) ............................................................................ 14

*Kapellas v. Kofman*,
    1 Cal. 3d 20 (1969) ........................................................................................... 15

*Karimi v. Golden Gate School of Law*,
    361 F. Supp. 3d 956 (N.D. Cal. 2019) ............................................................. 13

*Khodorkovskaya v. Gay*,
    5 F.4th 80 (D.C. Cir. 2021) ............................................................................... 13

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) ....................................................................... 9, 10

*M.G. v. Time Warner, Inc.*,
    89 Cal. App. 4th 623 (2001) ............................................................................... 8

*Mosesian v. McClatchy Newspapers*,
    233 Cal. App. 3d 1685 (1991) .......................................................................... 15

*Mossack Fonseca & Co., S.A. v. Netflix, Inc.*,
    2020 WL 8510342 (C.D. Cal. Dec. 23, 2020) ................................................ 12

*Partington v. Bugliosi*,
    56 F.3d 1147 (9th Cir. 1995) ...................................................................... 11, 15

*Pettitt v. Levy*,
    28 Cal.App.3d 484 (1972) ................................................................................ 12

iv

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

*Planet Aid, Inc. v. Ctr. for Investigative Reporting*,
   No. 17-CV-03695-MMC, 2021 WL 1110252 (N.D. Cal. Mar. 23,
   2021) ................................................................................................ 17

*Planet Aid, Inc. v. Reveal*,
   44 F.4th 918 (9th Cir. 2022) ........................................................... 15

*Polydoros v. Twentieth Century Fox Film Corp.*,
   67 Cal. App. 4th 318 (1997) ............................................................ 11

*Reader's Digest Ass'n v. Super. Ct.*,
   37 Cal. 3d 244 (1984) ...................................................................... 16

*Sarver v. Hurt Locker LLC*,
   2011 WL 11574477 (C.D. Cal. Oct. 13, 2011) ........................... 11, 12

*Scott v. McDonnell Douglas Corp.*,
   37 Cal. App. 3d 277 (1974) ............................................................. 12

*Seelig v. Infinity Broad. Corp.*,
   97 Cal. App. 4th at 812 .................................................................... 17

*Sipple v. Foundation for Nat'l Progress*,
   71 Cal. App. 4th 226 (1999) .............................................................. 8

*Standing Committee on Discipline of U.S. Dist. Court for Cent. Dist.
   of California v. Yagman*,
   55 F.3d 1430 (9th Cir. 1995) ........................................................... 10

*Stewart v. Rolling Stone LLC*,
   181 Cal. App. 4th 664 (2010) ............................................................ 9

*Tamkin v. CBS Broad., Inc.*,
   193 Cal. App. 4th 133 (2011) ................................................... 8, 9, 11

*Trinity Risk Mgmt., LLC v. Simplified Lab. Staffing Sols., Inc.*,
   59 Cal. App. 5th 995 (2021) .............................................................. 7

*Underwager v. Channel 9 Australia*,
   69 F.3d 361 (9th Cir. 1995) ............................................................. 15

*Varian Med. Sys., Inc. v. Delfino*,
   35 Cal. 4th 180 (2005) ....................................................................... 7

v

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

*Weyrich v. New Republic, Inc.*,
    235 F.3d 617 (D.C. Cir. 2001) ............................................................. 10

*Wynberg v. Nat'l Enquirer, Inc.*,
    564 F. Supp. 924 (C.D. Cal. 1982) .................................................... 14

## STATUTES

Cal. Civ. Code § 47(b) .......................................................................... 12

Cal. Code Civ. Proc. § 425.16(b)(1) ...................................................... 7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

## I.      INTRODUCTION.

Defendants Netflix, Inc. and Netflix Worldwide Entertainment, LLC (collectively, "Netflix") create and distribute artistic content.  Netflix provides storytellers like Richard Gadd ("Gadd")—the creator of, and lead actor in, *Baby Reindeer* (the "Series")—the opportunity to showcase their creative works.  The Series—a dramatic work based on real events in Gadd's life—follows Donny Dunn ("Donny"), a comedian who struggles with his sexual identity and past sexual abuse. The character Martha Scott ("Martha") stalks, harasses, and physically assaults Donny, forcing him to confront his insecurities.  Fiona Harvey, a woman who in real life actually stalked and harassed Gadd, attorney Laura Wray ("Wray") and others, alleges that the Martha character *is* her and brings defamation and derivative claims against Netflix.  Yet, Martha is not Harvey.  Harvey is not a character name, and the Series never uses Harvey's name in any way.  Netflix and Gadd never identified Harvey as someone who stalked him (and others) in real life.  Rather, it was Harvey who thrust herself into the spotlight and *identified herself* as the supposed inspiration for Martha.

The Series is a skillful exploration of sexual identity, sexual abuse, harassment, and stalking.  The first episode begins with an eerie musical score and farcical interaction between two characters.  The screen then abruptly goes dark, and "this is a true story" is slowly typed across the screen.  While the Series is based on Gadd's real-life trauma and emotions, the characters, scenes, dialogue, and events convey Gadd's story in an imaginative style that has garnered critical acclaim, numerous awards, and eleven Emmy nominations.  As is obvious to any reasonable viewer, the Series is *not* a factual documentary representing literally true details and imagery.

Harvey's contrary claims are a baseless attack on Netflix's exercise of free speech and barred by California's anti-Strategic Lawsuits Against Public Participation ("anti-SLAPP") statute.  Her claims all challenge Netflix's distribution

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

of the Series, which is plainly protected speech by the statute.  It is thus Harvey's burden to establish that her claims have minimal merit, which she cannot.  As even Harvey admitted during her interview with celebrity interviewer Piers Morgan, "Martha cannot be me . . .  [she] is a fictional character."  Harvey is correct: no reasonable viewer could understand the Series to make any statements of fact, let alone a statement specifically about Harvey.

All of that said:  Harvey did, in fact, harass and stalk Gadd in real life.  She sent him thousands of emails, handwritten letters, and social media posts, and left him hours of voicemails.  Many of those communications, which Gadd provided to the police, included prurient, violent and astoundingly racist, xenophobic, homophobic, and otherwise hateful content:  Harvey tells Gadd she wants to "stab [all Labour Party members] in the face," that she is glad she did not date Gadd because "[he] is gay and [she'd] have aids [sic]," and that she "hate[s] muslims" and is "a racist."  Harvey's own statements—and the mountain of evidence of her conduct toward Gadd and others—demonstrate that any of the purportedly defamatory statements she alleges were substantially true.  This too completely bars her claims.  But even if the statements were not substantially true (and they are), then all Netflix has done is publish a memoir of Gadd's story, which viewers reasonably understand is told through his own emotions and self-reflections.  This is opinion and thus cannot legally form the basis for her claims.

Finally, even if she could somehow overcome these constitutional protections, as a public figure, Harvey must demonstrate Netflix acted with actual malice in distributing the Series.  She cannot.  Her claims thus fail for this additional reason. Harvey is never mentioned in the Series, and there is a disclaimer in each episode to make clear the Series was fictionalized for dramatic purposes.  Netflix clearly did not intend for viewers to understand the Series to state actual facts about Harvey.

Simply stated, Harvey cannot establish the minimal merit needed to overcome the protections provided by the anti-SLAPP statute. The Court thus should grant Netflix's motion and strike Harvey's complaint in its entirety.

## II.   STATEMENT OF FACTS.

### A.   Gadd.

Gadd is a well-known Scottish comedian, writer, and actor who conceived, wrote, and starred in the Series. Declaration of Richard Gadd ("Gadd Decl.") ¶ 1. Gadd was inspired to write the Series by his struggles with his sexual identity and experiences with sexual abuse, harassment and stalking. *Id.* ¶ 8. He fictionalized characters to assist in telling his own personal, real experiences with trauma. *Id.* ¶ 5. He did not represent or make a statement about anyone real, including Harvey. *Id.* ¶ 13. Instead, Gadd intentionally created characters that did not share the real names of anyone from his real life and wrote fictionalized dialogue. *Id.* ¶ 10.

### B.   Netflix.

Netflix released the Series on its streaming service on April 11, 2024. Declaration of Anne Mensah ("Netflix Decl.") ¶ 3. Netflix understood the Series was a fictionalized work based on Gadd's real life. *Id.* ¶ 7. Netflix never would have released the Series had it believed the Series somehow would be understood as stating actual facts about any actual person. *Id.* ¶ 9. Netflix included a disclaimer at the end of every episode to make this clear. *Id.* ¶ 8.

### C.   Harvey.

Harvey resides in England, and admits she was on the "shortlist" to be a candidate for Parliament. Gadd Decl. Ex. 14. Harvey also has a publicly documented history of stalking Laura Wray, a Scottish lawyer, wife of Labour Party Member of Parliament Jimmy Wray; politician Donald Dewar, the inaugural First Minister of Scotland; and Prime Minister Keir Starmer, before eventually stalking Gadd. Declaration of Marvin S. Putnam ("Putnam Decl."), Exs. B, C, D. Harvey stalked and harassed Wray, made death threats against Wray and her husband, and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

made false reports to authorities that the couple mistreated their developmentally disabled child.  Declaration of Laura Wray ("Wray Decl.") ¶¶ 14, 19.  As a result, Wray was granted an Interim Interdict against Harvey, *id.* ¶ 23, akin to a temporary restraining order in the United States, *id.* ¶ 20.  The press reported on Harvey's alleged stalking of Wray and Dewar, and Harvey issued a public denial of both. Putnam Decl. Ex. M.

Harvey began stalking Gadd in 2014.  Gadd Decl. ¶ 14.  For three years, she would show up at the pub (Hawley Arms) where he worked, follow him, and attend his comedy shows.  *Id.* ¶¶ 14-15.  Harvey sent Gadd thousands of emails, hundreds of voicemails, and handwritten letters, often including sexual, violent, and derogatory content.  *Id.* ¶ 23.  Harvey, for example, warned Gadd to "shut [his] ignorant little failed actor mouth" because he was "finished."  *Id.* Ex. 29.  She declared her gratitude that they had never dated because "you are gay and I'd have aids."  *Id*.  In another email, she raged that "the minute I see [Labor Party members] I want to stab them in the face."  *Id.* Ex. 13.  She repeatedly propositioned Gadd, demanding that she "want[s] sex three times at night and twice in the morning."  *Id.* Ex. 19.  The communications were often filled with offensive, hateful speech, including that she "hate[s] muslims," *id.* Ex. 5, and is "a racist,"[1] *id.* Ex. 6.  Harvey also pinched and touched various parts of Gadd's body, and on one occasion shoved him in the neck and pointed in his face.  *Id.* ¶¶ 17, 19.  Gadd eventually obtained a First Instance Harassment Warning against Harvey.  *Id.* ¶ 53.  Craig Seymour, General Manager of the Hawley Arms pub, witnessed Harvey's stalking and harassment of Gadd first-hand, and describes her behavior as so "severe, unpleasant, and nasty" that she was barred from the pub.  Declaration of Craig Seymour ("Seymour Decl.") ¶¶ 1-10.

---

[1] For more examples of this harassment, please see Exhibits 1-41, 44-45, 47-48, 49-50 and 52 attached to the Gadd Declaration.

4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

**D.     The Series.**

The Series, which Netflix characterizes as an "offbeat, psychological" dramedy, follows fictionalized character Donny (played by Gadd), an aspiring comedian who grapples with his sexual identity and past sexual abuse.  Netflix Decl. ¶ 3.[2]  While Donny's character professes "this is a true story" once, in the first episode, each episode disclaims that: "This program is based on real events: however, certain characters, names, incidents, locations, and dialogue have been fictionalized for dramatic purposes."  *See, e.g.*, Ep. 1 at 30:43.

In the Series, Donny first meets Martha at his bartending job when she enters the pub crying.  *Id.* at 02:06.[3]  Donny feels sorry for her and gives her a free drink; Martha returns during Donny's shifts.  *Id.* at 02:25, 05:08.  When Martha says she needs someone to "hang her curtains," Donny jokes, with sexual innuendo, that he'll "hang her curtains."  *Id.* at 08:54.  Martha then starts appearing at his shows, frequently emails, asks him on dates, and sends a "friend request" on Facebook.  *Id.* at 20:21, 23:07, 09:44, 27:37.  This leads to Donny searching Martha's name on the Internet, and he discovers her history of stalking.  *Id.* at 28:22.

When Donny begins dating a transgender woman, he struggles with shame and embarrassment.  Ep. 2 at 03:20.  When she tries to publicly kiss him, he panics and flees.  *Id.* at 20:50.  Martha suddenly appears, follows him down a dark alley, corners him, and fondles him.  *Id.* at 22:04.  This assault triggers painful memories of Donny's prior sexual abuse.  *See generally* Ep. 4.  Martha, meanwhile, continues to stalk Donny, sitting outside his house for hours and harassing him at his comedy shows.  Ep. 3 at 12:20, 14:10, 27:07.  Donny repeatedly reports Martha to the police.  *See, e.g.*, Ep. 3 at 42:07; Ep. 5 at 15:44.  When Donny provides the police Martha's

---

[2] The Complaint relies on the Series and attaches screenshots of scenes; the Court thus may consider the entire Series, which is incorporated by reference.  *See, e.g.*, *Eliott v. Lions Gate Ent. Corp.*, 639 F. Supp. 3d 1012, 1021 (C.D. Cal. 2022).  A copy of the Series will be lodged with the Court.

[3] Citations to time stamps indicate time elapsed in the episode.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

1   full name, they inform him that she once stalked a policeman. *Id.* Ep. 5 at 16:23.

2   Martha once again shows up at Donny's work, they get into an argument, and Martha

3   hits Donny in the head with a glass, grabs his face, and digs her fingers into his eyes.

4   Ep. 6 at 14:10.

5     Shaken by the attack, Donny tries to perform at a comedy competition only to

6   become overwhelmed by emotion. *Id.* at 22:35. He suddenly details his history of

7   abuse in a cathartic monologue that goes viral, bringing Donny unexpected

8   recognition. *Id*; Ep. 7 at 00:20. Martha then tracks down Donny's cell number and

9   calls him incessantly. Ep. 7 at 1:47. At the police's suggestion, Donny then listens

10  to hours of voicemails to show she is a threat. *Id.* at 10:00. Her rapid-fire chatter

11  overlays a montage of Donny's daily activities. *Id* at 10:40. Martha ultimately

12  threatens to stab someone, *id.* at 12:55, and in a "dramatic[]" scene, Compl. ¶ 56,

13  she pleads guilty to stalking and harassment, is sentenced to prison, and a restraining

14  order is issued. Ep. 7 at 13:34. After the sentencing, Donny stops into a bar and

15  orders a drink. *Id.* at 25:50. In a poetic, full-circle moment, Donny starts to cry and

16  the bartender offers him the drink for free. *Id.* at 26:26.

17    **E.**  **Harvey's Allegations.**

18    Harvey alleges "all viewers" of the Series understood that Fiona Harvey did

19  the "monstrous things" that the character Martha did in the Series. Compl. ¶ 29.

20  Harvey alleges viewers understood the Martha character to be the real-life Harvey

21  because Donny jokes he will "hang [Martha's] curtains," and Harvey allegedly once

22  sent a tweet to Gadd that made a similar reference. *Id.* ¶¶ 30-39. Harvey further

23  alleges she shares similarities with Martha that reinforce this understanding: (1) they

24  are both Scottish lawyers living in London who were accused of stalking a lawyer;

25  (2) Martha is older than Donny and Harvey is older than Gadd; (3) they "bear[] an

26  uncanny resemblance" to one another; and (4) they have similar accents and manners

27  of speaking. *Id.* ¶¶ 40-41. According to Harvey, Netflix's statements on a marketing

28

website and before Parliament that the Series is a "true story" defame her for the same reason. *Id.* ¶¶ 71-80.

Yet, Harvey concedes that her name does not appear in the Series, there are no characters named after real persons, and dramatic scenes and content were created to make the story emotionally compelling. *Id.* ¶¶ 27, 56, 60. Harvey also concedes the portrayal of Martha is entirely "fabricated." *Id.* ¶ 27.

Two weeks after the Series aired on Netflix, Harvey identified herself on Facebook as the supposed inspiration for the Martha character. Putnam Decl. Ex. S. She then went on *Piers Morgan Uncensored* to reaffirm her claims. *Id.* ¶¶ 3-17, Ex. A.

## III.   LEGAL STANDARD.

California enacted the anti-SLAPP statute to deter lawsuits that would otherwise "chill the valid exercise of the constitutional right[] of freedom of speech." *Varian Med. Sys., Inc. v. Delfino*, 35 Cal. 4th 180, 192 (2005). The statute creates a "special motion to strike" such claims. *See Baral v. Schnitt*, 1 Cal. 5th 376, 392–94 (2016). If all causes of action are premised on protected activity, the Court must strike the entire complaint. *See Int'l Un. Of Operating Eng'n, Local 39 v. Macy's, Inc.*, 83 Cal. App. 5th 985, 996 (2022).

In evaluating an anti-SLAPP motion, the Court performs a two-step analysis. First, the defendant must show that plaintiff's claims arise from an act in furtherance of free speech under the United States or California Constitutions. Cal. Code Civ. Proc. § 425.16(b)(1). Once the moving party has shown that the challenged claims arise from protected activity, the court presumes the purpose of the action was to chill the defendant's exercise of its First Amendment rights. *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 422 (9th Cir. 2014). The nonmoving party then must demonstrate that the challenged claim is legally sufficient and substantiated. *Trinity Risk Mgmt., LLC v. Simplified Lab. Staffing Sols., Inc.*, 59 Cal. App. 5th 995, 1003–04 (2021). "If the nonmovant fails to meet

7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

1  either of [those] two requirements, the claim is subject to immediate dismissal." *See*

2  *Heller v. NBC Universal, Inc.*, 2016 WL 6583048, at *3 (C.D. Cal. June 29, 2016).

3  **IV.     THE COURT SHOULD GRANT NETFLIX'S MOTION.**

4        Harvey's claims are premised on Netflix's distribution of a fictionalized

5  television series and therefore arise from protected activity.  The burden thus shifts

6  to Harvey to demonstrate her claims have minimal merit.  She cannot meet this

7  burden.  She cannot establish Netflix made a provably false statement of fact *about*

8  *her*.  Even if she could get past these essential steps, she cannot show that Netflix

9  acted with actual malice.  Her Complaint must be stricken.

10       **A.     Harvey's Claims Arise From Protected Activity.**

11       Harvey's claims plainly arise from protected activity.  They are premised on

12  distribution of the Series.  And the Series constitutes discourse of widespread public

13  interest.

14              1.     The Claims Arise Out of Conduct in Furtherance of Speech.

15       The creation of film and television are core free speech activities protected by

16  the First Amendment.  *See De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th

17  845, 849–50 (2018); *Tamkin v. CBS Broad., Inc.,* 193 Cal. App. 4th 133, 143–44

18  (2011); *Brodeur v. Atlas Enter., Inc.*, 248 Cal. App. 4th 665, 674 (2016).  Netflix's

19  distribution of the Series is therefore protected speech entitled to protection under

20  the anti-SLAPP statute.  *Id.*; *see also De Havilland*, 21 Cal. App. 5th at 851, 856–

21  57, 859–60 (anti-SLAPP protection for airing a television series); *Brodeur*, 248 Cal.

22  App. 4th at 674–78 (same).

23              2.     The Speech Is Connected with an Issue of Public Interest.

24       The subject matter of the Series—sexual abuse, harassment and stalking—are

25  indisputably topics of widespread, public interest.  *See, e.g.*, *M.G. v. Time Warner,*

26  *Inc.*, 89 Cal. App. 4th 623, 629 (2001) (child molestation issue of public interest);

27  *Cross v. Cooper*, 197 Cal. App. 4th 357, 375 (2011) (sex offender); *Sipple v.*

28  *Foundation for Nat'l Progress*, 71 Cal. App. 4th 226, 238 (1999) (domestic

8

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

violence).  This is further evidenced by the media attention to the Series including its writing, directing, and acting.  Putnam Decl., Exs. G-L; Netflix Decl. at ¶ 4; *see also, e.g.*, *Tamkin*, 193 Cal. App. 4th at 143 (television show protected where public demonstrated interest in creation).

The subject matter of the Series also allegedly concerns Gadd, who is indisputably in the public eye.  *See, e.g.*, Compl. ¶¶ 19-20, 24, 27; Gadd Decl. ¶¶ 2-4, 8.  Gadd has been a recognized actor and writer for years.  *See* Putnam Decl., Exs B-G.  There is a "public interest which attaches to people [like Gadd] who, by their accomplishments, mode of living, professional standing or calling," attract the public's "attention to their activities."  *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 677–78 (2010).

## B.     Harvey's Claims Are Meritless.

As Harvey's claims arise from protected activity, she has the burden to prove they are legally sufficient and substantiated.  She cannot for four independent reasons:  (1) she cannot establish Netflix made any provably false statement *about her*; (2) the statements are substantially true; (3) the statements are legally protected opinion; and (4) Harvey, a public figure, cannot establish actual malice.

### 1.     Harvey Cannot Show Netflix Made Provably False Statements of Fact *About Her*.

A defamation claim must be premised on a statement that is provably false; statements cannot form the basis of a defamation action if they cannot reasonably be interpreted as stating actual facts *about an individual*.  *Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1401 (1999).  Courts thus consider "whether a reasonable person . . . would understand that the fictional character therein pictured was, in actual fact, the plaintiff acting as described."  *Tamkin*, 193 Cal. App. 4th at 146.  Courts do so by looking at the "totality of the circumstances."  *Knievel v. ESPN*, 393 F.3d 1068, 1074-75 (9th Cir. 2005).  Courts consider the broad context for the statements, including the general tenor of the work, the specific context and content of the

9

statements, the extent of figurative or hyperbolic language, the reasonable expectations of the audience, and "whether the statement itself is sufficiently factual to be susceptible of being proved true or false." *Id.* at 1075; *see also De Havilland*, 21 Cal. App. 5th at 866–67 (2018) (courts must analyze statement's broad context). In context, no reasonable viewer could understand the Series to convey statements of fact about Harvey.  She is never mentioned.

a. *No Reasonable Viewer Could Understand The Series As Making Factual Statements About Harvey.*

Harvey does not contend the Series uses historical footage of her, uses her name or names of real persons, or depicts real events from her actual life.  Nor could she.  The Series includes fictional characters, events, and dialogue employed specifically to explore traumatic experiences from Gadd's life.  *See* Gadd Decl. ¶¶ 5, 8, 13.

Harvey therefore stakes her entire case on her allegation that internet sleuths supposedly identified her from a single tweet sent a decade ago from an account @FionaHarvey2014 to @MrRichardGadd.  Compl. ¶ 35.  According to Harvey, this single tweet made it easy for members of the public to identify her as the Martha character.  *Id.* ¶ 36.  But the test is not whether a select group of uniquely motivated individuals can ferret out a possible connection between a real person and a fictional character.  *See Standing Committee on Discipline of U.S. Dist. Court for Cent. Dist. of California v. Yagman*, 55 F.3d 1430, 1437-38 (9th Cir. 1995) (specialized audience not representative of reasonable person); *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 626 (D.C. Cir. 2001) (same).  Rather, it is Harvey's burden to show that *reasonable viewers* would understand Martha to be Harvey.  *Aguilar v. Universal City Studios, Inc.*, 174 Cal. App. 3d 384, 391 (1985).  This she cannot do.

Harvey merely asserts that broad similarities between her and Martha—*e.g.*, that she is a lawyer, living in London, older than Gadd, accused of stalking a lawyer—would cause a reasonable viewer to understand the Series to be "of and

10

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

concerning" her.  Compl. ¶¶ 40-41.  Such generalities are insufficient.  *See e.g.,* *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 320, 322 (1997) (statements not "of and concerning" plaintiff despite character sharing similar name); *Aguilar*, 174 Cal. App. 3d at 388 (no reasonable viewer would understand film to be about plaintiff despite sharing name with character and being involved in real events portrayed); *Sarver v. Hurt Locker LLC*, 2011 WL 11574477, at *8 (C.D. Cal. Oct. 13, 2011) (same); *Tamkin,* 193 Cal. App. 4th at 146-47 (similar names, occupations, and other characteristics insufficient).  This is especially true here given that Harvey disclaims any other similarities between herself and Martha, who she admits is entirely "fabricated."  Compl. ¶ 27; Putnam Decl. ¶¶ 4-17, Ex. A at 7:33; 14:49; 17:22.  The alleged broad similarities do not demonstrate a reasonable viewer would understand the Series to be about Harvey.  Indeed, members of the public have speculated that several other women and a man, sharing many of the same qualities, may have been the inspiration for the Martha character.  Putnam Decl. Exs. Q, S.

Moreover, the general tenor, style, and format of the Series ensure that a reasonable viewer would not understand it to convey literally factual statements— including the stylized card that reads "this is a true story" in Martha's trademark font.  The Series makes clear to the viewer that they are watching a fictionalized work.  It does not purport to be a documentary.  Rather, as Harvey concedes, the Series employed actors, writers, producers, and executives who "fabricated" the story to make it "more captivating."  Compl. ¶ 27.  And the Series is replete with cinematic elements, including, *inter alia*, a dramatic score, creative cinematography, reverse and inconsistent chronology, intentionally ironic and absurd scenes, and a disembodied narrator that gives the audience insight into Donny's thoughts, that remind the viewer that this is not a documentary or even an attempt at realism.  Ep. 1 at 00:10; 01:36; Ep. 4 at 08:20; 20:21; Gadd Decl. ¶¶ 5, 9-10, 13.  *See e.g., Partington v. Bugliosi*, 56 F.3d 1147, 1154-55 (9th Cir. 1995) (tenor of dramatized

11

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

1   films about real events negate impression that statements represent assertion of fact).

2   And the disclaimer appearing in *every episode* of the Series dispels any notion that

3   it is depicting real events as they happened, which alone defeats Harvey's claims.

4   *See, e.g., Brodeur*, 248 Cal. App. 4th at 680 (no reasonable viewer would understand

5   film as conveying objective facts given disclaimer); *Mossack Fonseca & Co., S.A.*

6   *v. Netflix, Inc.*, 2020 WL 8510342, at *4 (C.D. Cal. Dec. 23, 2020) (no reasonable

7   viewer would interpret film as conveying fact given disclaimer stating film is

8   fictionalized for dramatization); *Sarver*, 2011 WL 11574477, at *8 (same).

9               b.   *The Context Demonstrates the Alleged Statements Are Not*
10                   *Factual.*

11          None of the claimed defamatory statements can, in context, be construed by a

12   reasonable viewer as factual, *i.e.* that: (1) Martha had received a 4.5 year prison

13   sentence; (2) Martha was a convicted stalker; (3) Martha sexually assaulted Donny

14   by grabbing his genitals; (4) Martha stalked Donny by sitting outside his house for

15   hours a day; (5) Martha stalked a policeman; (6) Martha assaulted Donny by

16   smashing a glass into his head and gouging his eyes; and (7) Martha pleaded guilty

17   and was convicted of stalking and harassment, sentenced to nine months in prison

18   and had a five-year restraining order issued against her.[4]   Compl. ¶¶ 52-70.  To the

19   contrary, each is presented in the context of stylistic, cinematic choices that only

20   reaffirm for the viewer that the Series is not a precise portrayal of historical fact.  As

21   but one example, Martha's prior stalking conviction is revealed as the Turtles' peppy

22   "Happy Together" is played.  Ep. 1 at 28:38.  The clash of dark content and the

23   upbeat, romantic ballad reminds the viewer that this is clearly not a documentary.

24

25   [4] The statements allegedly made on Tudum.com and by Mr. King before Parliament
26   are likewise not identifiable as statements of fact *about Harvey*.  These statements
     also never mention Harvey, and no reasonable viewer of the Series would understand
27   those statements to concern her.  Regardless, statements before Parliament are
     absolutely privileged under Cal. Civ. Code § 47(b) and cannot form the basis of a
28   defamation claim.  *See Scott v. McDonnell Douglas Corp.*, 37 Cal. App. 3d 277, 288,
     293 (1974); *Pettitt v. Levy*, 28 Cal.App.3d 484, 488 (1972).

12

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

1  *Films of Distinction, Inc. v. Allegro Film Prods., Inc.*, 12 F. Supp. 2d 1068, 1081

2  (C.D. Cal. 1998) (use of rhetoric to convey defamation negates supposed assertion

3  of objective fact).

4  　　In fact, the fantastical, surreal cinematic elements that accompany Martha

5  grabbing Donny's genitals, sitting outside his house for days, and being convicted

6  and sentenced all make clear that the Series is not a realistic portrayal of real-life

7  events.  Martha's assault follows Donny's date where cinematography and sound

8  illustrate Donny's growing queasiness and literal tunnel vision.  Ep. 2 at 20:50.  So

9  too, Martha's lengthy vigil outside Donny's house is dramatically accelerated,

10  showing the passage of time as days fade into night and back to day.  Ep. 3 at 14:10.

11  And the Martha character's final conviction and sentencing is preceded by a frenetic

12  sequence that involves her voice playing over a montage of Donny—the audio often

13  sped up or reversed to add to the fever-dream quality of the scene.  Ep. 7 at 12:24.

14  Immediately following is a perfectly poetic moment where Donny finds himself in

15  the same situation where he met Martha.  *Id.* at 28:18.  In these contexts, and in the

16  context of the Series as a whole, no reasonable viewer would understand the Series

17  to be making statements of fact.  *See Khodorkovskaya v. Gay*, 5 F.4th 80, 86–88

18  (D.C. Cir. 2021) (context not factual where dramatic devices framed statements);

19  *see also Brodeur*, 248 Cal. App. 4th at 680 (statement not factual where made by

20  "slightly unhinged" character).

21  　　　　　2.　　The Alleged Defamatory Statements Are Substantially True.

22  　　The alleged defamatory statements (*i.e.*, Harvey is a convicted stalker who

23  stalked, sexually assaulted and violently attacked Gadd) are *substantially true*.

24  Substantial truth is a complete defense to alleged defamation, and a statement is

25  substantially true so long as its substance or gist is justified.  *See Eliott*, 639 F. Supp.

26  3d at 1027; *Karimi v. Golden Gate School of Law*, 361 F. Supp. 3d 956, 979 (N.D.

27  Cal. 2019).  Courts thus routinely hold that where, as here, plaintiff engaged in

28  conduct akin to that asserted by defendant, a defamation claim must be dismissed.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

1    *Eliott*, 639 F. Supp. 3d at 1026-27.

2         The evidence proves that Harvey (i) stalked and harassed Wray, Gadd, and

3    others; (ii) sexually and physically assaulted Gadd; and (iii) faced legal

4    consequences for her criminal conduct warranting conviction if prosecuted.  *See*

5    Gadd Decl. ¶¶ 16-17, Wray Decl. ¶¶ 8-13, Seymour Decl. ¶¶ 1-10.  In many respects,

6    Harvey's actual conduct is far *worse* than Martha's cinematic actions.  The

7    thousands of actual emails, handwritten letters, social media posts, and voicemails

8    sent by Harvey are awash with violent hate speech and sexually explicit, deeply

9    disturbing vitriol that is nowhere depicted in the Series.  Gadd Decl. Exs. 3-41.

10   Indeed, Louise Oakley, an experienced Senior Prosecutor in the United Kingdom,

11   reviewed Gadd, Wray, and Seymour's declarations and Harvey's emails, letters, and

12   voicemails and concludes "there was sufficient evidence to provide a realistic

13   prospect of conviction" of stalking punishable by up to eight years in prison.  *See*

14   Expert Declaration of Louise Michelle Oakley ¶¶ 80-84.  Harvey cannot show that

15   her real-life offenses would have a different—*and more positive*—effect on the

16   audience than the allegedly defamatory statements.  *Jackson v. Mayweather*, 10 Cal.

17   App. 5th 1240, 1262–63 (2017), as modified (Apr. 19, 2017) (no defamation where

18   plaintiff could not establish inaccurate statement would have *more negative* effect

19   than truth).  The alleged defamatory statements are thus nonactionable as they are

20   substantially true.[5]

21              3.    Alleged Defamatory Statements Are Non-Actionable Opinion.

22         Even if the alleged defamatory statements were not substantially true (and

23   they are), the First Amendment protects Richard Gadd's right to tell his own story,

24   his way.  The law protects "an author writing about a controversial occurrence [who]

25   fairly describes the general events involved and offers his personal perspective about

26   _____

27   [5] Given Harvey's history of stalking, harassment, and resulting legal action—
     publicized before the Series' distribution—Harvey is also libel-proof.  *See Wynberg*

28   *v. Nat'l Enquirer, Inc.*, 564 F. Supp. 924,  927-28 (C.D. Cal. 1982).  The purported
     defamatory statements are therefore not actionable for this additional reason.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

some of its ambiguities and disputed facts." *Partington*, 56 F. 3d at 1154. Crucially, where the storyteller was personally involved in the controversial story, viewers and listeners fully expect that the storyteller is biased and preferential to his own view. *See Ferlauto*, 74 Cal. App. 4th at 1401-03. In these circumstances, "language which generally might be considered as statements of fact may well assume the character of opinion." *Id.* at 1401-02; *see also Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir. 1995). In the Series, Gadd told of a trying, troubling point in his life, which viewers reasonably understood was colored by his own viewpoint. In this context, the alleged defamatory statements "assume the character of statements of opinion" and are not actionable. *Ferlauto*, 74 Cal. App. 4th at 1401-02; *see also Partington*, 56 F. 3d at 1154; *Heller*; 2016 WL 6583048 at *7.

### 4.   Harvey Cannot Establish Actual Malice.

Even if Harvey were able to surmount all these precursor elements of defamation, she cannot come close to meeting the exacting standard for actual malice. The First Amendment prohibits public figures from asserting defamation claims unless they demonstrate the defendant made the alleged defamation with "actual malice." *De Havilland*, 21 Cal. App. 5th at 856. Harvey is indisputably a public figure. For instance, courts have consistently held that persons running for office are the paradigmatic public figures. *See Kapellas v. Kofman*, 1 Cal. 3d 20, 36 (1969); *see also Mosesian v. McClatchy Newspapers*, 233 Cal. App. 3d 1685, 1696 (1991). Harvey admits she not only ran for Parliament but was "o[n the] shortlist[]." Gadd Decl. Ex. 14; *see also* Putnam Decl., Exs. M, T. She is thus precluded from now claiming she is not a public figure. Harvey also voluntarily injected herself into a public controversy, namely her stalking and harassment of Laura Wray and Donald Dewar. Compl. ¶ 41; Putnam Decl. Ex. M. Thus, at a minimum, Harvey is a limited purpose public figure on issues related to stalking, harassment, and assault. *Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 927 (9th Cir. 2022); *see also Denney v. Lawrence*,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

22 Cal. App. 4th 927, 936 (1994) (plaintiff limited purpose public figure where he thrust himself into controversy).

Either way, Harvey would need to prove by "clear and convincing evidence" that Netflix made the alleged defamatory statements with actual malice—that is, knowing the Series "would create a false impression about [her] or act[ing] with reckless disregard for the truth." *De Havilland*, 21 Cal. App. 5th at 869. Fictionalized works like the Series are by definition false and Netflix's mere broadcast does not somehow demonstrate actual malice. *Id.*; *Dworkin v. Hustler Magazine, Inc.*, 668 F. Supp. 1408, 1418 n.15 (C.D. Cal. 1987). Harvey instead must demonstrate Netflix either hoped to insinuate the "defamatory import" or "knew or acted in reckless disregard of whether [their] words would be interpreted by the average [viewer] as defamatory statements of fact." *De Havilland*, 21 Cal. App. 5th at 869-70. This she cannot do.

Rather, Netflix's conduct demonstrates it did not intend viewers to understand the Series to state any actual facts about Harvey. Netflix never publicly named or mentioned Harvey. Netflix Decl. ¶ 10. And Netflix understood that Gadd purposefully created fictitious characters, and invented dialogue and scenes. *Id.* ¶ 7. Each episode also contained a disclaimer to make clear the Series was fictionalized for dramatic purposes. *Id.* ¶ 8. Harvey also acknowledges that both Netflix and Gadd attempted to disguise any sources of inspiration for Gadd's work. Compl. ¶¶ 34, 77. This is the antithesis of actual malice.[6] Such conduct instead demonstrates that Netflix intended viewers to understand the work to be fictional and did not act with reckless disregard. *See Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1194-95 (9th Cir. 1989).

---

[6] Netflix's alleged failure to conduct due diligence cannot legally establish actual malice, as failure to investigate does not demonstrate bad faith, even when a reasonably prudent person would have done so. *Beilenson v. Super. Ct.*, 44 Cal. App. 4th 944, 952 (1996); *Christian Rsch. Inst. v. Alnor*, 148 Cal. App. 4th 71, 90-91 (2007); *Reader's Digest Ass'n v. Super. Ct.*, 37 Cal. 3d 244, 258 (1984).

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

### C.     Harvey's Other Claims Should Also Be Stricken.

Harvey's other claims for intentional infliction of emotional distress, negligence, gross negligence, and right of publicity (Compl. ¶¶ 97-130) are premised on the same publication (the Series) as the defamation claim, and thus should be stricken as duplicative. *See, e.g.*, *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 34 (2007) (striking duplicative IIED); *Planet Aid, Inc. v. Ctr. for Investigative Reporting*, No. 17-CV-03695-MMC, 2021 WL 1110252, at *24 (N.D. Cal. Mar. 23, 2021) (striking duplicative negligence claim); *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 812 (2002) (same).  These claims also independently fail for the reasons set forth in Netflix's concurrently filed motion to dismiss.  *See* MTD at 11-17.

## V.     CONCLUSION.

Netflix respectfully requests that the Court grants its motion to strike.


Dated:  July 29, 2024                    Respectfully submitted,

                                         LATHAM & WATKINS LLP
                                         Marvin S. Putnam

                                         By  /s/ *Marvin S. Putnam*
                                         Marvin S. Putnam
                                         Attorneys for Defendants

1

**CERTIFICATE OF COMPLIANCE**

2    The undersigned, counsel of record for Defendants Netflix, Inc., and Netflix

3  Worldwide Entertainment, LLC, certifies that this brief contains 5,584 words, which

4  complies with the word limit of the Court's standing order.   In making this

5  calculation, I have relied on the word count of the word-processing system used to

6  prepare the document.

7

8  Dated: July 29, 2024                        By:  */s/ Marvin S. Putnam*

9                                                    Marvin S. Putnam

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY