LATHAM & WATKINS LLP
  Marvin S. Putnam (Bar No. 212839)
    *marvin.putnam@lw.com*
  Laura R. Washington (Bar No. 266775)
    *laura.washington@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Telephone: +1.424.653.5500
Facsimile: +1.424.653.5501

*Attorneys for Defendants*
Netflix, Inc., and
Netflix Worldwide Entertainment, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIONA HARVEY,<br><br>        Plaintiff,<br><br>  v.<br><br>NETFLIX, INC., and NETFLIX WORLDWIDE ENTERTAINMENT, LLC,<br><br>        Defendants. | Case No. 2:24-cv-04744-RGK-AJR<br><br>**EXPERT DECLARATION OF LOUISE MICHELLE OAKLEY IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE**<br><br>Date:     September 3, 2024<br>Time:    9:00 a.m.<br>Place:   Courtroom 850<br><br>Hon. R. Gary Klausner |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

## EXPERT DECLARATION OF LOUISE MICHELLE OAKLEY

I, Louise Michelle Oakley, declare as follows:

1.      I am over the age of eighteen and competent to make this declaration.

2.      Unless otherwise stated, all facts stated herein are within my personal knowledge and are true and correct. If called upon, I would be willing to testify as set forth in this declaration.

3.      I have been retained as an expert witness in this matter by Defendants Netflix, Inc. and Netflix Worldwide Entertainment, LLC (collectively, "Netflix") to opine on (i) based on my review of materials provided to me, whether any criminal offence(s) under the Protection of Harassment Act 1997 are disclosed; and (ii) based on my review of materials provided to me, whether any other criminal offences are disclosed.

4.      I am being compensated for the time I spent preparing this declaration at my customary rate of £385 per hour. The opinions I express in this declaration are my own. My compensation does not depend upon the outcome of this case, the contents of this declaration, or any testimony I may provide in this case.

5.      In forming my opinions, I have read and considered the materials discussed below. I have also relied on my education, experience, and expertise in forming my opinions.

6.      This declaration summarizes the opinions I have formed to date. I reserve the right to modify or update my opinion, if necessary, based on my review and analysis of information or materials that I may receive after this declaration is submitted.

## I.      Background and Qualifications

7.      I hold the following professional qualifications: Bachelor of Arts degree, Postgraduate Diploma in Law, and Postgraduate Diploma in Legal Practice (Bar Vocational Course).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

8.      I was called to the Bar of England and Wales in July 2001, and I am a member of the Honourable Society of Middle Temple. Before qualifying as a barrister, an individual must complete a final training stage, known as a pupillage. I commenced the non-practising period of my pupillage in October 2001. I commenced the practising period of my pupillage in May 2002. I qualified as a barrister in October 2002.

9.      I practice in criminal law (both prosecution and defence). Since May 2002, I have received thousands of instructions in criminal cases. I have conducted hundreds of trials throughout the criminal courts in England and Wales. As a result, I regularly advise on the sufficiency of evidence and the appropriateness of charges in offences of violence, such as murder and manslaughter, non-fatal assaults and offences against the person, offences under the Protection from Harassment Act, malicious communications, sexual offences, breaches of protective orders, drugs, and dishonesty.

10.     In England and Wales, the prosecution of cases is predominantly undertaken by the Crown Prosecution Service ("CPS"). The CPS has its own 'in-house' advocates, and it also instructs the independent Bar to advise and conduct advocacy. To accept instructions from the CPS, a barrister must be on the CPS Advocate Panel. This is a time-limited list of quality assured advocates who are deemed suitable to undertake criminal prosecution for the CPS in the Magistrates' courts, Youth courts, Crown Courts and Higher Courts. There are 4 grades, grade 1 being the lowest and 4 being the most senior. In January 2012, I was placed on the CPS's Advocate Panel for General Crime at Level 3 and the Specialist Panel for Rape and Sexual Offences. In March 2015, I was placed on the CPS's Advocate Panel for General Crime at Level 4

11.     In April 2015, I was instructed as counsel to Sir Richard Henriques to conduct an independent review of the Crown Prosecution Service's decision-making and handling of all past matters relating to Lord Greville Janner.

3

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

12.    In February 2016, I was instructed as Counsel to Sir Richard Henriques when he was asked by the Commissioner of the Metropolitan Police to conduct an independent review of the Metropolitan Police Service's handling of non-recent sexual offence allegations against persons of public importance.

13.    On 1 April 2024, I was appointed by the Attorney General as Senior Treasury Counsel. Treasury Counsel are a team of specialist advocates in the United Kingdom who prosecute many of the most serious and complex cases in the country, and advise and appear on behalf of the Law Officers, and other government departments. Senior Treasury Counsel are no longer required to be on the CPS Advocate Panel as they are deemed senior and experienced enough to cover all prosecution work. There are only seven Senior Treasury Counsel in England. I am the first female appointed as Senior Treasury Counsel having not been appointed as Junior Treasury Counsel since 1865.

14.    Recent instructions involving offences contrary to the Protection of Harassment Act 1997 include:

15.    Case 1. The Defendant was a Solicitor employed by the Crown Prosecution Service. The Defendant was alleged to have stalked their former partner over a period of 16 months causing them serious alarm and/or distress. The conduct included monitoring the complainant's movements, tracking the complainant's motor vehicle, monitoring the complainant's social media account, accessing personal emails/messages and other personal information, threatening to share/sharing highly personal information about the complainant, and repeatedly attending an address knowing such attendance was unwanted. The complainant was a District Judge.

16.    Case 2. The Defendant stalked a 'beauty influencer' in Canada and the United Kingdom. The conduct took place over a four-month period after the Defendant had started following the complainant several years before. The Defendant repeatedly attended the complainant's place of work, made numerous

4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

telephone calls, and sent various messages before attending the complainant's workplace in possession of bladed articles.

17. My curriculum vitae is attached as Exhibit 1. I have not authored any publications in the last 10 years and have not testified as an expert at trial or by deposition in the previous four years.

## II. Background Regarding The Range of Criminal Offences Available Under the Protection of Harassment Act 1997

18. The Protection from Harassment Act 1997 describes itself as an Act "*to make provision for protecting persons from harassment and similar conduct*". It was passed for the purpose of dealing with the phenomenon of 'stalking'.

19. The main harassment and stalking offences in England and Wales can be found in sections 2, 2A, 4 and 4A of the Protection from Harassment Act 1997. Section 32 of the Crime and Disorder Act 1998 creates racially or religiously aggravated versions of the Protection from Harassment Act 1997.

20. Section 1 of the Protection from Harassment Act 1997 provides:

> *"Prohibition of harassment*
> *(1) A person must not pursue a course of conduct—*
> *(a) which amounts to harassment of another, and*
> *(b) which he knows or ought to know amounts to harassment of the other.*
> *(1A)[1] A person must not pursue a course of conduct —*
> *(a) which involves harassment of two or more persons, and*
> *(b) which he knows or ought to know involves harassment of those persons, and*
> *(c) by which he intends to persuade any person (whether or not one of those mentioned above)—*
> *(i) not to do something that he is entitled or required to do, or*
> *(ii) to do something that he is not under any obligation to do.*
> *(2) For the purposes of this section or section 2A(2)(c)[2], the person*

---

[1] Section 1(1A) inserted by Serious Organised and Crime and Police Act 2005.

[2] Words in section 1(2) 'or section 2A(2)(c)' inserted by Protection of Freedoms Act 2012.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

*whose course of conduct is in question ought to know that it amounts to or involves[3] harassment of another if a reasonable person in possession of the same information would think the course of conduct amounted to harassment of the other.*

*(3) Subsection (1) or (1A)[4] does not apply to a course of conduct if the person who pursued it shows—*

*(a) that it was pursued for the purpose of preventing or detecting crime.*

*(b) that it was pursued under any enactment or rule of law or to comply with any condition or requirement imposed by any person under any enactment, or*

*(c) that in the particular circumstances the pursuit of the course of conduct was reasonable."*

21. There is no attempt at a definition of harassment in the Act, although references to harassing a person include alarming the person or causing the person distress (section 7(2) of the Protection from Harassment Act 1997).

22. In *Thomas v News Group Newspapers Ltd [2001] EWCA Civ 1233*, it was held that the Act is concerned with conduct targeted at an individual, which was calculated to produce alarm or distress, and which was oppressive and unreasonable.

23. In *Dowson v Northumbria Police [2010] EWHC 2612 (QB)*, it was held (after an extensive review of the authorities) that for conduct to constitute harassment within the Act it must be objectively judged as oppressive and unacceptable. What is oppressive and unacceptable may depend on the social or working context in which the conduct occurs, and a line is to be drawn between conduct which is unattractive and unreasonable and conduct which amounts to "*torment*" of the victim or is "*of an order which would sustain criminal liability*".

24. In *R v O'Neill [2016] EWCA Crim 92*, the Court of Appeal confirmed that the definition in section 7 Protection from Harassment 1997 is inclusive and not

---

[3] Words in section 1(2) 'or involves' inserted by Serious Organised and Crime and Police Act 2005.

[4] Words in section 1(3) 'or 1A' inserted by Serious Organised and Crime and Police Act 2005.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

exhaustive. 'Harassment' is generally understood to involve improper, oppressive, and unreasonable conduct that is targeted at an individual and calculated to produce the consequences described in section 7.

25. The question of what constitutes a course of conduct has been considered in a number of cases, and the answer will always be fact sensitive. Conduct includes speech. A course of conduct in relation to a single person must involve conduct on at least two occasions in relation to that person (section 7(3)(1) of the Protection from Harassment Act 1997). Thus, while two incidents can constitute a 'course of conduct', the fewer the incidents and the greater separation in time, the less likely it is that they could be described as a 'course of conduct'.

26. In *Jones v DPP [2010] EWHC 523 (Admin) [2011] 1 WLR 833*, it was held that: there is no requirement that each individual act forming part of a course of conduct must be of sufficient gravity to be a crime in itself; nevertheless the fewer the incidents, the more serious each is likely to have to be for the course of conduct to amount to harassment and the facts of a separately charged offence (in the instant case, a racially aggravated public order offence), whether they lead to a conviction or not, are capable of forming part of the course of conduct; however, where the specific facts relative to a separate charge have led to a conviction, and where it is that conviction which makes all the difference between a course of conduct falling short of harassment and amounting to harassment, it would be oppressive and unfair for those facts in effect to lead to two convictions.

27. Section 2 of the Protection from Harassment Act 1997 provides:

> *"Offence of harassment.*
>
> *(1) A person who pursues a course of conduct in breach of section 1(1) or (1A) is guilty of an offence."*

28. A person guilty of an offence under section 2 of the Protection of Harassment Act 1997 is liable on summary conviction to imprisonment for a term not exceeding six months, or an unlimited fine, or both.

7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

29.     Section 4 of the Protection from Harassment Act 1997 provides:

***"Putting people in fear of violence***

*(1) A person whose course of conduct causes another to fear, on at least two occasions, that violence will be used against him is guilty of an offence if he knows or ought to know that his course of conduct will cause the other so to fear on each of those occasions.*

*(2) For the purposes of this section, the person whose course of conduct is in question ought to know that it will cause another to fear that violence will be used against him on any occasion if a reasonable person in possession of the same information would think the course of conduct would cause the other so to fear on that occasion.*

*(3) It is a defence for a person charged with an offence under this section to show that—*

*(a) his course of conduct was pursued for the purpose of preventing or detecting crime,*

*(b) his course of conduct was pursued under any enactment or rule of law or to comply with any condition or requirement imposed by any person under any enactment, or*

*(c) the pursuit of his course of conduct was reasonable for the protection of himself or another or for the protection of his or another's property.*

*...*

*(5)  If on the trial on indictment of a person charged with an offence under this section the jury find him not guilty of the offence charged, they may find him guilty of an offence under section 2 or 2A[5].*

*(6)  The Crown Court has the same powers and duties in relation to a person who is by virtue of subsection (5) convicted before it of an offence under*

---

[5] Words in section 4(5) and 5 (6) 'or section 2A' inserted by Protection of Freedoms Act 2012.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

*section 2 or 2A as a magistrates' court would have on convicting him of the offence."*

30.    A person guilty of an offence under section 4 of the Protection of Harassment Act 1997 is liable on conviction on indictment to imprisonment for a term not exceeding ten years,[6] or a fine or both, or on summary conviction to imprisonment for a term not exceeding six months, or an unlimited fine, or both.

31.    The Protection from Harassment Act 1997 did not originally define "stalking" or proscribe it. To remedy the situation, the Protection of Freedoms Act 2012 created two new offences which were inserted into the Protection of Harassment Act 1997:

i.    Stalking, which is harassment where the acts or omissions involved in the course of conduct are ones associated with stalking, such as following somebody, contacting them or monitoring their electronic communications (section 2A); and

ii.    Stalking involving fear of violence or serious alarm and distress, which is stalking which, on at least two occasions, causes the victim to fear that violence will be used against them, or causes them serious alarm or distress which has a substantial adverse effect on their usual day to day activities (Section 4A).

32.    These new offences highlighted stalking as a specific behaviour as opposed to harassment more generally, and closed the gap when a course of conduct fell short of causing a victim to feel fear of violence but nevertheless caused a victim serious alarm or distress.

33.    Section 2A of the Protection from Harassment Act 1997 provides:

**"Offence of stalking**

---

[6] Increased from 5 years to 10 years by Policing and Crime Act 2017.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

(1) A person is guilty of an offence if—

    (a) the person pursues a course of conduct in breach of section 1(1), and

    (b) the course of conduct amounts to stalking.

(2) For the purposes of subsection (1)(b) (and section 4A(1)(a)) a person's course of conduct amounts to stalking of another person if—

    (a) it amounts to harassment of that person,

    (b) the acts or omissions involved are ones associated with stalking, and

    (c) the person whose course of conduct it is knows or ought to know that the course of conduct amounts to harassment of the other person.

(3) The following are examples of acts or omissions which, in particular circumstances, are ones associated with stalking—

    (a) following a person,

    (b) contacting, or attempting to contact, a person by any means,

    (c) publishing any statement or other material—

    (i) relating or purporting to relate to a person, or

    (ii) purporting to originate from a person,

    (d) monitoring the use by a person of the internet, email or any other form of electronic communication,

    (e) loitering in any place (whether public or private),

    (f) interfering with any property in the possession of a person,

    (g) watching or spying on a person.

...

(6) This section is without prejudice to the generality of section 2."

34. A person guilty of an offence under section 2A of the Protection of Harassment Act 1997 is liable on summary conviction to imprisonment for a term not exceeding six months, or an unlimited fine, or both.

10

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

35.     Section 4A of the Protection from Harassment Act 1997 provides:

**"Stalking involving fear of violence or serious alarm of distress**

*(1) A person ("A") whose course of conduct—*

    *(a) amounts to stalking, and*

    *(b) either—*

        *(i) causes another ("B") to fear, on at least two occasions, that violence will be used against B, or*

        *(ii) causes B serious alarm or distress which has a substantial adverse effect on B's usual day-to-day activities,*

    *is guilty of an offence if A knows or ought to know that A's course of conduct will cause B so to fear on each of those occasions or (as the case may be) will cause such alarm or distress.*

*(2) For the purposes of this section A ought to know that A's course of conduct will cause B to fear that violence will be used against B on any occasion if a reasonable person in possession of the same information would think the course of conduct would cause B so to fear on that occasion.*

*(3)     For the purposes of this section A ought to know that A's course of conduct will cause B serious alarm or distress which has a substantial adverse effect on B's usual day-to-day activities if a reasonable person in possession of the same information would think the course of conduct would cause B such alarm or distress.*

*...*

*(7)     If on the trial on indictment of a person charged with an offence under this section the jury find the person not guilty of the offence charged, they may find the person guilty of an offence under section 2 or 2A."*

36.     A person guilty of an offence under section 4A of the Protection of Harassment Act 1997 is liable on conviction on indictment to imprisonment for a

term not exceeding ten years,[7] or a fine or both, or on summary conviction to imprisonment for a term not exceeding six months, or an unlimited fine, or both.

37. Thus, the elements of an offence, contrary to section 4A are: (i) A course of conduct; (ii) which amounts to stalking; and (iii) causes another to fear, on at least two occasions, that violence will be used against them; and/or (iv) causes another serious alarm or distress which has a substantial adverse effect on his or her usual day to day activities.

38. The terms "*serious alarm or distress*" and "*which has a substantial adverse effect on his or her usual day to day activities*" are not defined.

39. What is clear is that this offence recognises the overall emotional and psychological harm that stalking may cause to victims, even where an explicit fear of violence is not created by each incident of stalking behaviour. Thus, it is the cumulative effect of the stalking on the victim and the effect and nature of the individual incidents that is important and not the effect of any one particular incident.

40. Home Office guidance suggests that evidence of "*a substantial adverse effect on his or her usual day to day activities*" may include the following: (i) a victim changing their routes to work, work patterns or employment; (ii) a victim arranging for friends or family to pick up children from school to avoid contact with their stalker; (iii) a victim putting in place additional security measures in their home; (iv) a victim moving home; (v) physical or mental ill health; (vi) the deterioration in the victim's performance at work due to stress; (vii) the victim stopping or changing the way they socialise.

41. This is not an exhaustive list and there will be some victims who will try to continue their lives as usual in defiance of their stalker.

## III. Background Regarding Racially or Religiously Aggravated Offending

42. An offence is racially or religiously aggravated if at the time of

---

[7] Increased from 5 years to 10 years by Policing and Crime Act 2017.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

committing the offence, or immediately before or after doing so, the suspect demonstrates towards the victim of the offence hostility based on the victim's membership (or presumed membership) of a racial or religious group; or the offence is motivated (wholly or partly) by hostility towards members of a racial or religious group based on their membership of that group (section 28 of the Crime and Disorder Act 1998).

43.     Section 32 of the Crime and Disorder Act 1998 creates racially or religiously aggravated versions of the Protection from Harassment Act offences (section 2, 2A, 4 and 4A), which have higher maximum sentences. The maximum sentence for offences contrary to section 2 and 2A that are racially/religiously aggravated is two years imprisonment. The maximum sentence for offences contrary to section 4 and 4A that are racially/religiously aggravated is fourteen years imprisonment.

44.     In *Cain v DPP [2022] EWHC 1466 (Admin)* the circumstances and context of any words used must be considered. The mere utterance of a word or term that is capable of being racially abusive is not necessarily decisive.

45.     If section 28 of the Crime and Disorder Act does not apply the sentence uplift provisions (which preexisted but were codified by section 66 of the Sentencing Act 2020) will apply.

46.     Section 66 of the Sentencing Act provides:

> ***Hostility***
> *(1) This section applies where a court is considering the seriousness of an offence which is aggravated by—*
> *(a) racial hostility,*
> *(b) religious hostility,*
> *(c) hostility related to disability,*
> *(d) hostility related to sexual orientation, or*
> *(e) hostility related to transgender identity.*
> *     This is subject to subsection (3).*
> *(2) The court—*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

*(a) must treat the fact that the offence is aggravated by hostility of any of those types as an aggravating factor, and*

*(b) must state in open court that the offence is so aggravated.*

*(3) So far as it relates to racial and religious hostility, this section does not apply in relation to an offence under sections 29 to 32 of the Crime and Disorder Act 1998 (racially or religiously aggravated offences).*

*(4) For the purposes of this section, an offence is aggravated by hostility of one of the kinds mentioned in subsection (1) if—*

*(a) at the time of committing the offence, or immediately before or after doing so, the offender demonstrated towards the victim of the offence hostility based on—*

*(i) the victim's membership (or presumed membership) of a racial group,*

*(ii) the victim's membership (or presumed membership) of a religious group,*

*(iii ) a disability (or presumed disability) of the victim,*

*(iv) the sexual orientation (or presumed sexual orientation) of the victim,*

*(v) the victim being (or being presumed to be) transgender, or*

*(b) the offence was motivated (wholly or partly) by—*

*(i) hostility towards members of a racial group based on their membership of that group,*

*(ii) hostility towards members of a religious group based on their membership of that group*

*(iii) hostility towards persons who have a disability or a particular disability,*

*(iv) hostility towards persons who are of a particular sexual orientation,*

*(v) hostility towards persons who are transgender.*

*(5)  For the purposes of paragraphs (a) and (b) of subsection (4), it is immaterial whether or not the offender's hostility is also based, to any extent, on any other factor not mentioned in that paragraph.*

*(6) In this section—*

*(a) references to a racial group are to a group of persons defined by reference to race, colour, nationality (including citizenship) or ethnic or national origins;*

14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

*(b) references to a religious group are to a group of persons defined by reference to religious belief or lack of religious belief;*

*(c) "membership" in relation to a racial or religious group, includes association with members of that group;*

*(d) "disability" means any physical or mental impairment;*

*(e) references to being transgender include references to being transsexual, or undergoing, proposing to undergo or having undergone a process or part of a process of gender reassignment;*

*(f) "presumed" means presumed by the offender.*

47. Thus where an offence under the Protection from Harassment Act 1997 involves hostility based upon race, religion, sexual orientation, transgender identity, or disability the offence(s) will be aggravated when determining the correct sentence.

## IV. Background Regarding 'First Instance Harassment Warnings' and Legal Status

48. The police may issue notices where there are allegations of harassment.

49. These notices were referred to using various names, including "Police Information Notices" (PINS), "Harassment Warning Notices" or "Early Harassment Notices" or "First Instance Harassment Warnings".

50. The Metropolitan Police stopped using 'First Instance Harassment Warnings' from midnight on 31 January 2020. Other options were to be used instead. These include Anti-Social Behavior Orders, civil injunctions pursuant to the Protection from Harassment Act, Stalking Protection Orders and, where appropriate, Restraining Orders on conviction/acquittal in the Magistrates and Crown Courts.

51. **'First Instance Harassment Warnings.'** Police forces across England and Wales started to issue these notices after loopholes were identified after the enactment of the Protection from Harassment Act 1997 when those suspected of stalking claimed that they did not know that their behaviour (such as sending flowers, cards etc.) amounted to harassment and that their intention was not to cause

15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

the victim to be either harassed, alarmed or distressed. To this end, police forces began issuing suspects with a formal 'notice of warning' that the victim alleges that their behaviour did indeed cause harassment, alarm and distress and that, should such activity continue, a prosecution would ensue. Such notices could then be used in future legal proceedings to demonstrate that the suspect was aware that their behaviour could amount to harassment.

52. Where a 'First Instance Harassment Order' had been issued, the police officer should have recorded that fact, the nature of the notice, and offered it to the individual to sign. This indicated their receipt and understanding. It may have been necessary to caution the individual if they made any relevant comments. Any relevant comments made by the individual should have been recorded in the police officer's pocket notebook and the individual should be asked to endorse the record.

53. The police were entitled to record details of the 'notice' under their Common Law powers to obtain and store information for policing purposes (such as preventing and detecting crime and preserving civil order). There was no fixed period. Instead, the period would vary from case to case and would be flexible to allow for information to be deleted when retaining it would no longer serve any useful policing purpose.

## V. Background Regarding the General Principles That Prosecutors Should Follow When Deciding Whether There Is Enough Evidence to Charge an Individual with a Criminal Offence(s)

54. The Code for Crown Prosecutors is a public document, issued by the Director of Public Prosecutions, that sets out the general principles Prosecutors should follow when they make decisions on cases under section 10 of the Prosecution of Offences Act 1985. The current version is the eighth edition of the Code and replaces all earlier versions.

55. **General Principles.** The following general principles apply:

i. The independence of the prosecutor is central to the criminal justice system

16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

of a democratic society. Prosecutors are independent from persons or agencies that are not part of the prosecution decision-making process. CPS prosecutors are also independent from the police and other investigators. Prosecutors must be free to carry out their professional duties without political interference and must not be affected by improper or undue pressure or influence from any source.

ii. It is not the function of a Prosecutor to decide whether a person is guilty of a criminal offence, but to make assessments about whether it is appropriate to present charges for the criminal court to consider. The assessment of any case is not in any sense a finding of, or implication of, any guilt or criminal conduct. A finding of guilt can only be made by a court.

iii. Similarly, a decision not to bring criminal charges does not necessarily mean that an individual has not been a victim of crime. It is not the role of the CPS to make such determinations.

iv. The decision to prosecute or to recommend an out-of-court disposal is a serious step that affects suspects, victims, witnesses, and the public at large and must be undertaken with the utmost care.

v. It is the duty of prosecutors to make sure that the right person is prosecuted for the right offence and to bring offenders to justice wherever possible. Casework decisions taken fairly, impartially and with integrity help to secure justice for victims, witnesses, suspects, defendants, and the public. Prosecutors must ensure that the law is properly applied, that relevant evidence is put before the court and that obligations of disclosure are complied with.

vi. Although each case must be considered on its own facts and on its own merits, there are general principles that apply in every case.

vii. When making decisions, prosecutors must be fair and objective. They must not let any personal views about the ethnic or national origin, gender,

17

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

disability, age, religion or belief, sexual orientation, or gender identity of the suspect, defendant, victim, or any witness influence their decisions. Neither must they be motivated by political considerations. Prosecutors must always act in the interests of justice and not solely for the purpose of obtaining a conviction.

viii.    Prosecutors must be even-handed in their approach to every case, and have a duty to protect the rights of suspects and defendants, while providing the best possible service to victims.

ix.    The CPS is a public authority for the purposes of current, relevant equality legislation. Prosecutors are bound by the duties set out in this legislation.

x.    Prosecutors must apply the principles of the European Convention on Human Rights, in accordance with the Human Rights Act 1998, at each stage of a case. They must comply with any guidelines issued by the Attorney General and with the policies and guidance of the CPS issued on behalf of the DPP, unless it is determined that there are exceptional circumstances. CPS guidance contains further evidential and public interest factors for specific offences and offenders and is available for the public to view on the CPS website. Prosecutors must also comply with the Criminal Procedure Rules and Criminal Practice Directions, and have regard to the Sentencing Council Guidelines and the obligations arising from international conventions.

56.    **The Decision Whether to Prosecute.**    In more serious or complex cases, prosecutors decide whether a person should be charged with a criminal offence and, if so, what that offence should be. Prosecutors may also advise on or authorise out-of-court disposals as an alternative to prosecution. They make their decisions in accordance with this Code, the DPP's Guidance on Charging, and any relevant legal guidance or policy. The police apply the same principles in deciding whether to start criminal proceedings against a person in those cases for which they are responsible.

18

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

57.     The police and other investigators are responsible for conducting inquiries into any alleged crime and for deciding how to deploy their resources. This includes decisions to start or continue an investigation and on the scope of the investigation. Prosecutors should advise the police and other investigators about possible reasonable lines of inquiry, evidential requirements, pre-charge procedures, disclosure management, and the overall investigation strategy. This can include decisions to refine or narrow the scope of the criminal conduct and the number of suspects under investigation. Such advice assists the police and other investigators to complete the investigation within a reasonable period of time and to build the most effective prosecution case.

58.     Prosecutors cannot direct the police or other investigators. However, prosecutors must have regard to the impact of any failure to pursue an advised reasonable line of inquiry or to comply with a request for information, when deciding whether the application of the Full Code Test should be deferred or whether the test can be met at all.

59.     Prosecutors should identify and, where possible, seek to rectify evidential weaknesses but, subject to the Threshold Test, they should quickly stop cases which do not meet the evidential stage of the Full Code Test and which cannot be strengthened by further investigation, or where the public interest clearly does not require a prosecution.

60.     Although prosecutors primarily consider the evidence and information supplied by the police and other investigators, the suspect or those acting on their behalf may also submit evidence or information to the prosecutor, before or after charge, to help inform the prosecutor's decision. In appropriate cases, the prosecutor may invite the suspect or their representative to do so.

61.     Prosecutors should not start or continue a prosecution where their view is that it is highly likely that a court will rule that a prosecution is an abuse of its process, and stay the proceedings.

19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

62.     Prosecutors review every case they receive from the police or other investigators. A review is a continuing process and prosecutors must take account of any change in circumstances that occurs as the case develops. This includes what becomes known of the defence case, any further reasonable lines of inquiry that should be pursued, and receipt of any unused material that may undermine the prosecution case or assist the defence case, to the extent that charges should be altered or discontinued or the prosecution should not proceed.

63.     Parliament has decided that a limited number of offences should only be taken to court with the agreement of the DPP. These are called consent cases. In such cases the DPP, or a prosecutor acting on their behalf, applies the Code in deciding whether to give consent to a prosecution. There are also certain offences that can only be taken to court with the consent of the Attorney General. Prosecutors must obtain such consent prior to charge and apply any relevant guidance in these cases.

64.     **The Full Code Test.** Prosecutors must only start or continue a prosecution when the case has passed both stages of the Full Code Test. The exception is when the Threshold Test may be applied. This may be applied when the seriousness or circumstances of the case must justify the making of an immediate charging decision, and there must be substantial grounds to object to bail.

65.     The Full Code Test has two stages. The first is the evidential stage. The second is the public interest stage. In most cases, prosecutors should only consider whether a prosecution is in the public interest after considering whether there is sufficient evidence to prosecute. However, there will be cases where it is clear, prior to reviewing all the evidence, that the public interest does not require a prosecution. In these instances, prosecutors may decide that the case should not proceed further. Prosecutors should only take such a decision when they are satisfied that the broad extent of the criminality has been determined and that they are able to make a fully informed assessment of the public interest. If prosecutors do not have sufficient

20

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

information to take such a decision, the investigation should continue and a decision taken later in accordance with the Full Code Test set out in this section.

66. **The Evidential Stage.** Prosecutors must be satisfied that there is sufficient evidence to provide a realistic prospect of conviction against each suspect on each charge. They must consider what the defence case may be, and how it is likely to affect the prospects of conviction. A case which does not pass the evidential stage must not proceed, no matter how serious or sensitive it may be.

67. The finding that there is a realistic prospect of conviction is based on the prosecutor's objective assessment of the evidence, including the impact of any defence and any other information that the suspect has put forward or on which they might rely. It means that an objective, impartial, and reasonable jury or bench of magistrates or judge hearing a case alone, properly directed and acting in accordance with the law, is more likely than not to convict the defendant of the charge alleged. This is a different test from the one that the criminal courts themselves must apply. A court may only convict in that context if it is sure that the defendant is guilty.

68. When deciding whether there is sufficient evidence to prosecute, prosecutors should ask themselves the following:

   i.   Can the evidence be used in court?

   ii.   Is the evidence reliable?

   iii.   Is the evidence credible?

   iv.   Is there any other material that might affect the sufficiency of evidence?

69. **The Public Interest Stage.** In every case where there is sufficient evidence to justify a prosecution or to offer an out-of-court disposal, prosecutors must go on to consider whether a prosecution is required in the public interest.

70. It has never been the rule that a prosecution will automatically take place once the evidential stage is met. A prosecution will usually take place unless the prosecutor is satisfied that there are public interest factors tending against prosecution which outweigh those tending in favour. In some cases the prosecutor

21

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

may be satisfied that the public interest can be properly served by offering the offender the opportunity to have the matter dealt with by an out-of-court disposal rather than bringing a prosecution.

71.    When deciding the public interest, prosecutors should consider each of the questions set out below so as to identify and determine the relevant public interest factors tending for and against prosecution. These factors, together with any public interest factors set out in relevant guidance or policy issued by the DPP, should enable prosecutors to form an overall assessment of the public interest.

72.    The questions identified are not exhaustive, and not all the questions may be relevant in every case. The weight to be attached to each of the questions, and the factors identified, will also vary according to the facts and merits of each case.

73.    It is quite possible that one public interest factor alone may outweigh a number of other factors which tend in the opposite direction. Although there may be public interest factors tending against prosecution in a particular case, prosecutors should consider whether nonetheless a prosecution should go ahead and those factors put to the court for consideration when sentence is passed.

74.    Prosecutors should consider each of the following questions:

i.    How serious is the offence committed?

ii.    What is the level of culpability of the suspect?

iii.    What the are circumstances of and the harm caused?

iv.    What was the suspect's age and maturity at the time of the offence?

v.    What is the impact on the community?

vi.    Is prosecution a proportionate response?

75.    **Selection of Charges.** Prosecutors should select charges which: (i) reflect the seriousness and extent of the offending; (ii) give the court adequate powers to sentence and impose appropriate post-conviction orders; (iii) allow a

22

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

confiscation order to be made in appropriate cases, where a defendant has benefitted from criminal conduct; and (iv) enable the case to be presented in a clear and simple way.

76.     This means that prosecutors may not always choose or continue with the most serious charge where there is a choice and the interests of justice are met by selecting the lesser charge.

77.     Prosecutors should never proceed with more charges than are necessary just to encourage a defendant to plead guilty to a few. In the same way, they should never proceed with a more serious charge just to encourage a defendant to plead guilty to a less serious one.

78.     Prosecutors should not change the charge simply because of the decision made by the court or the defendant about where the case will be heard.

79.     Prosecutors must take account of any relevant change in circumstances as the case progresses after charge.

## VI.     Opinion as to Whether any Criminal Offence(s) Under the Protection of Harassment Act 1997 Are Disclosed in the Materials Provided

80.     I have been provided with and have reviewed the following materials:

i.     Statement from Richard Gadd dated 28 July 2024;

ii.     Statement from Craig Seymour dated 28 July 2024;

iii.     Statement from Laura Wray dated 26 July 2024;

iv.     Emails from Fiona Harvey to Richard Gadd: (Emails between 5 July 2014 – 28 December 2014; emails between 1 January 2015 – 23 December 2015; emails between 3 February 2016 – 24 September 2016);

v.     Pages of screenshots from a Facebook account in the name of Fiona Harvey;

vi.     Screenshots from a Facebook account in the name of Fiona Harvey;

vii.     Audio files containing recordings of voicemails left by Fiona Harvey on a mobile telephone number belonging to Richard Gadd;

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

viii. Handwritten notes / letters sent to Richard Gadd by Fiona Harvey;

ix. Schedules of 'Tweets' by @FionaHarvey2014;

x. Emails sent by Richard Gadd to the police.

81. The following matters can be discerned from this material:

i. Richard Gadd met Fiona Harvey in 2014 while he was employed at the Hawley Arms Public House in Camden, London, United Kingdom.

ii. Fiona Harvey was a patron at the Hawley Arms Public House.

iii. Richard Gadd first noticed Fiona Harvey as she was alone and looked distressed. In a gesture of kindness Richard Gadd offered her a cup of tea on the house and took time to engage with her in friendly conversation.

iv. Thereafter, Fiona Harvey frequently attended the Hawley Arms Public House. So frequent were her attendances at the Hawley Arms Public House that she learnt Richard Gadd's shift pattern.

v. When Fiona Harvey attended the Hawley Arms Public House during Richard Gadd's shifts she would just sit at the bar. Initially they chatted but over time Fiona Harvey's conduct became a cause for concern and affected Richard Gadd's ability to work. Her behaviour appears to have become obsessive. She would interrupt / interject when he was serving other customers at the bar and tables, she repeatedly tried to engage with him by trying to make jokes / banter adopting smutty innuendos to try and embarrass him, and she would try and touch him inappropriately.

vi. That touching was sexual at times. Fiona Harvey would pinch Richard Gadd's bottom. She was, in Richard Gadd's words, "very handsy" towards him. This behaviour was unwelcome and unrelenting. Richard Gadd would try and 'dodge' Harvey's advances and unwanted physical contact.

vii. Richard Gadd repeatedly asked Fiona Harvey to leave him alone and to refrain from making physical / sexual advances towards him. These requests were ignored.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

viii. On one occasion, Richard Gadd recalled Fiona Harvey telling another patron inside the Hawley Arms Public House that they had had sex together. This was not true. When Richard Gadd challenged Fiona Harvey she became hostile towards him.

ix. Fiona Harvey's behaviour became more intense and volatile.

x. As a result, Richard Gadd would hide in the basement of the Hawley Arms Public House or on a balcony for hours in the hope that she would leave. Staff would tell Fiona Harvey that he was not working to try and get her to leave.

xi. Craig Seymour worked as the General Manager at the Hawley Arms Public House between July 2006 and June 2019. He witnessed Fiona Harvey's conduct towards Richard Gadd firsthand. He describes how Fiona Harvey figured out Richard Gadd's shift patterns and would turn up to the pub on the days he worked and would stand outside waiting for him to arrive. She would then sit at the end of the bar and talk to him constantly throughout his shifts. He observed Fiona Harvey's interactions with Richard Gadd and the sexual nature of comments she made towards him and the fantasy world she appeared to live in. He also describes how Fiona Gadd's behaviour was initially tongue in cheek and flirtatious but quickly became much more dark / serious.

xii. When Richard Gadd was not working she would call the Hawley Arms Public House to check if he was there. On other occasions she would wait outside the Hawley Arms Public House for him to finish work and would follow him.

xiii. Fiona Harvey would attend (uninvited) comedy and theatre performances that Richard Gadd was involved with. Such attendances were not a coincidence and can only have occurred as a result of Fiona Harvey monitoring his social media and intentionally and deliberately ascertaining

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

what he was doing away from the Hawley Arms Public House. Richard Gadd went to great lengths to prevent Fiona Harvey attending / remaining at such performances.

xiv.    By July 2014, Fiona Harvey obtained Richard Gadd's email address, which he assumes she found on his personal website. Fiona Harvey's email communications to Richard Gadd became relentless. The messages are at times sexually explicit / motivated. She would make comments about her body, her menstrual cycle, her breasts, her nipples, her pubic hair, and his body.  Other messages appeared to be a stream of consciousness containing racial, religious, and homophobic slurs. They also contained violent, hateful speech, threats, and other derogatory content. The emails are sent at all times of the day including during the night / early hours of the morning. Richard Gadd showed a number of emails he received from Fiona Harvey to Craig Seymour.

xv.    Shortly after Richard Gadd showed the emails to Craig Seymour, he told Fiona Harvey that she was no longer welcome at the Hawley Arms Public House and that she would not be allowed in. He expressly told Fiona Harvey that she was harassing one of his staff members.  Notwithstanding the fact Fiona Harvey was not allowed to enter the Hawley Arms Public House, she continued to turn up and wait outside on the days Richard Gadd was working. Staff resorted to trying to sneak Richard Gadd into the Hawley Arms Public House via a side entrance so that he could avoid Fiona Harvey and, on occasions, Craig Seymour would have to go outside and tell her to leave.

xvi.    Fiona Harvey monitored Richard Gadd's social media and would send him emails abouts matters he had posted / commented upon.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

xvii. Over time, Richard Gadd became scared of Fiona Harvey and what she was capable of. Such fear was fueled by articles Richard Gadd had seen and read online about Fiona Harvey's harassment of Jimmy and Laura Wray.

xviii. In February 2016, Richard Gadd contacted the police about Fiona Harvey's continued conduct towards him. In May 2016, he contacted the police again about Fiona Harvey's conduct towards him and the hundreds of emails he continued to receive from her. At this time, Richard Gadd was advised that a 'First Instance Harassment Warning Letter' had been issued against Fiona Harvey and that the Hawley Arms Public House were shown as the victim.

xix. Undeterred, Fiona Harvey continued to send hundreds of emails to Richard Gadd.

xx. In September 2016, Fiona Harvey obtained Richard Gadd's mobile telephone number while he was on holiday in Croatia. At this time, Richard Gadd had switched on an 'out of office' automated reply on his email account. The 'out of office' reply contained his mobile telephone number.

xxi. Having obtained Richard Gadd's mobile telephone number, Fiona Harvey also started to ring him leaving hundreds of voicemails lasting many hours. As with the emails, the voicemails included graphic details about Harvey's sexual exploits, stories about catching sexually transmitted diseases, threats towards Richard Gadd, his co-workers, and other victims of Harvey's stalking and harassment. It is also clear that Fiona Harvey had obtained information about Richard Gadd's family.

xxii. Notably, during the course of leaving many hours of voicemails, Fiona Harvey threatened Richard Gadd not to tell the police about the voicemails / emails and claimed to have access to the police files. She also threatened him with physical violence and told him not to tell anyone about her stalking him. By September 2016, Fiona Harvey was clearly angered that

27

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

1    Richard Gadd had contacted the police and was aware that he had taken

2    steps to prevent her from contacting him.

3    xxiii.   By February 2017, Richard Gadd understood that Fiona Harvey had been

4    issued with a further 'First Instance Harassment Warning' in which he was

5    identified as the victim.  After this notice was issued to Fiona Harvey the

6    emails and voicemails mostly stopped.  Although her conduct did not stop

7    completely. In August 2017, Fiona Harvey sent Richard Gadd a letter

8    containing a pair of knickers. While the letter acknowledged she was still

9    blocked from sending Richard Gadd any emails, it is clear that she was

10   continuing to monitor his movements as she was able to send him this letter.

11   xxiv.   Fiona Harvey's conduct plagued Richard Gadd's life continuously over a

12   period of approximately 3 – 4 years. He became fearful of her and was

13   continually caused serious alarm and distress by her conduct, such that it

14   had a substantial adverse effect on his mental health and his usual day to

15   day activities. It affected his ability to work, his daily routines, where he

16   visited and who he spent time with. He had to block her sending him emails

17   and calling his mobile telephone. Her conduct affected his ability to sleep,

18   he became paranoid, and was fearful of using public transport in case he

19   saw her. Richard Gadd describes Fiona Harvey's conduct as *"exhausting*

20   *and extremely upsetting to deal with her constant personal interactions in*

21   *the Hawley Arms, her following me around London including near where I*

22   *lived and her relentless and deeply unpleasant communications.  As I*

23   *explain above, I was frightened about what she might be capable of, given*

24   *the progressive hostility and escalation in her communications, and volume*

25   *of her conduct"*.

26   82.    Based on the materials provided to me, I am in no doubt that Fiona

27   Harvey pursued a course of conduct towards Richard Gadd that amounted to

28   stalking. Her conduct involved improper, oppressive, and grossly offensive conduct

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

that was wholly unreasonable. Such conduct amounted to the harassment of Richard Gadd and caused him serious alarm and distress which in turn had a substantial adverse effect on his usual day to day activities. He also feared physical violence. It is clear that by 2017, Fiona Harvey was well aware that her conduct amounted to stalking, and she admitted as much herself in voicemails including where she threatened him not to tell anyone about her "stalking" him. By this time, Richard Gadd had repeatedly asked Fiona Harvey to leave him alone and to stop contacting him. She had been 'barred' from the Hawley Arms Public House, Craig Seymour had told her that she was harassing a member of his staff, her emails had been blocked, her telephone calls had been blocked, and eventually she was issued with two 'First Instance Harassment Warnings'. She was also the subject of separate complaints of harassment / stalking by Laura Wray. Fiona Harvey can have been in no doubt that her conduct amounted to the harassment of Richard Gadd and that her conduct and the content of the messages would cause serious alarm or distress. If, on the materials currently before me, applying the full code test I was asked to advise as to whether there was sufficient evidence to provide a realistic prospect of conviction against Fiona Harvey on a particular charge(s) and whether a prosecution was required in the public interest, I would be satisfied, and I opine, that there was sufficient evidence to provide a realistic prospect of conviction in respect of at least one charge of stalking contrary to section 4A of the Protection from Harassment Act 1997. I note that it is not my function to decide whether a person is guilty of a criminal offence, but to make assessments about whether it is appropriate to advise on charges for a criminal court to consider. In doing so, I understand that the question I have to consider is whether an objective, impartial and reasonable jury, hearing the evidence and having been properly directed in accordance with the law, is more likely than not to convict a suspect of the charge alleged. Much of evidence is contained in emails and voice recordings and is therefore reliable and credible.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

83.     While many of the emails and voicemails contain racial and religious hostilities in which Fiona Harvey expressly states that she is a 'racist', I am not satisfied that Fiona Harvey's conduct towards Richard Gadd was motivated by these racial or religious hostilities. The motivation for Fiona Harvey's conduct appears to have been borne out of an obsessive sexual fascination with Richard Gadd himself. Plainly her conduct was grossly offensive and such hostilities would aggravate any sentence.

84.     In relation to sentence, if this case was being sentenced in a court in England and Wales, the relevant Sentencing Council Guidelines are effective from 1 October 2018.  In my opinion, Fiona Harvey's culpability would be assessed as being very high due to the extreme nature of her conduct, the persistence of her conduct, and the period over which her offending took place, and the harm caused to Richard Gadd would be placed within category 1. Fiona Harvey's conduct caused very serious distress to Richard Gadd and caused him to make considerable changes to his lifestyle to avoid contact. The grossly violent and offensive material sent by Fiona Harvey would be an additional aggravating factor. As a result, the starting point for a single offence would be 5 years imprisonment with a category range of 3 ½ years  -  8 years custody.

## VII.    Opinion as to Whether any Other Criminal Offence(s) Are Disclosed in the Materials Provided

85.     Based on the materials provided to me, it is my opinion that the unwanted sexual touching (including the pinching of Richard Gadd's bottom) while he was employed at the Hawley Arms Public House is capable of amounting to a sexual assault[8] contrary to section 3 of the Sexual Offences Act 2003. Such conduct must be considered in light of the whole of Fiona Harvey's conduct towards Richard

---

[8] A sexual assault is where one person intentionally touches another person sexually without their consent and that person does not reasonably believe that the other person consents.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
EXPERT DECL. OF LOUISE MICHELLE OAKLEY
ISO DEFENDANTS' SPECIAL MOTION TO STRIKE

1  Gadd over a number of years. Her intention was, in my opinion, plainly sexual in
2  light of her actions and the comments made in emails and voicemails.

3      86.    In relation to sentence, the maximum sentence is 10 years
4  imprisonment. If this case was being sentenced in a court in England and Wales, the
5  relevant Sentencing Council Guidelines are effective from 1 April 2014. Section
6  59(1) of the Sentencing Act 2020 provides that, "every court must in sentencing an
7  offender, follow an sentencing guidelines which are relevant to the offender's case,
8  and must in exercising any other function relating to the sentencing of offenders,
9  follow any sentencing guidelines which are relevant to the exercise of the function,
10  unless the court is satisfied that it would be contrary to the interests of justice to do
11  so." In my opinion, it would not be in the interests of justice for a court to follow the
12  sentencing guideline for sexual assault. The relevant factors set out in the Guidelines
13  do not adequately reflect the culpability of Fiona Harvey and/or the harm caused to
14  Richard Gadd on the particular facts of this case. Fiona Harvey did not commit one
15  single sexual offence. She committed multiple incidents, over a number of months.
16  While the touching was over clothing, it was committed while Richard Gadd was
17  working, in front of work colleagues and other members of the public. In addition,
18  Fiona Harvey's offending caused very serious distress to Richard Gadd that affected
19  his mental health and involved additional degradation and humiliation. In my
20  opinion, the repeated nature of Fiona Harvey's conduct passes the custody threshold
21  and a sentence of up to 2 - 3 years custody may be appropriate for this offence.

22

23      I declare under penalty of perjury under the laws of the United States of
24  America that the foregoing is true and correct.
25      Executed on July 29, 2024 in London, United Kingdom.

26

27  _____
28                    Louise Michelle Oakley

31

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-A
EXPERT DECL. OF LOUISE MICHELLE OAKLE
ISO DEFENDANTS' SPECIAL MOTION TO STRI

# EXHIBIT 1

# <u>CURRICULUM VITAE</u>

**Louise Michelle Oakley**

Inn of Court:      Middle Temple
Call:             July 2001

## <u>EDUCATION AND QUALIFICATIONS</u>

Sept 1996 – June 1999    BA (Hons) Applied Social Studies
                               Class 2:1 obtained

Sept 1999 – June 2000    Postgraduate Diploma in Law
                               Result – Pass

Sept 2000 – June 2001    Postgraduate Diploma in Law (Bar Vocational Course)
                               Result – Very Competent

## <u>RELEVANT LEGAL EXPERIENCE</u>

### <u>1st & 2nd SIX PUPILLAGE</u>

Oct 2001- Dec 2002      Staple Inn Chambers, 9 Staple Inn, Holborn Bars, London, WC1V 7QH

### <u>TENANCY</u>

Dec 2002- July 2005     Bell Yard Chambers, 116/118 Chancery Lane, London, WC2A 1PP

July 2005 – Oct 2006    Chambers of Mark Love, 2 Paper Buildings, Temple, EC4Y 7ET

Oct 2006 – Jan 2020     Chambers of William Clegg QC, 2 Bedford Row, London, WC1R 4BU

Jan 2020 – Date           Chambers of Mark Heywood & Sarah Forshaw, 5 Kings Bench Walk, Temple, EC4Y 7DN

I have experience in all forms of criminal advocacy in the Magistrates Court, Crown Court and the Court of Appeal, acting as sole or junior counsel. Since 2017 I have predominately prosecuted offences of homicide involving firearms and other weapons at the Central Criminal Court in London.

I advise and prosecute cases on behalf of the Homicide and Central Casework Divisions, including murder, manslaughter, gross negligence manslaughter and serious criminal allegations against police officers, CPS lawyers and civil servants. I also undertake work on behalf of the Serious Crime Unit, which includes organised crime and cases typically investigated by the National Crime Agency, as well as other law enforcement bodies, such as the Probation Service, Home Office, Immigration Enforcement and specialist Police units.

## <u>NOTABLE INSTRUCTIONS</u>

- **R v MW. Central Criminal Court**
  Junior Prosecution Counsel led by Tom Little QC before Mrs Justice McGowan at the Central Criminal Court. Defendant charged with two separate murders committed in 1998 of Leonard Harris and Rose Seferian. Case made legal history when Weir was convicted as he is the first person ever to be convicted of the same murder twice! Weir was originally convicted in July 1999 of the murder of Leonard Harris. That conviction was quashed by the Court of Appeal in 2000 on the basis that a DNA profile on the DNA database used for comparative purposes should not have been retained. In 2017 a match was found between Weir's palm print at the Seferian crime scene. That led to a reinvestigation of the Harris murder where it was discovered that a palm print inside the Harris's home address matched Weir and advances in DNA meant that new DNA evidence was also found. Prosecution put to strict proof re continuity of palm prints found a both scenes involving a painstaking review of records held by the fingerprint bureau.

- **R v T. Kingston Crown Court and the Court of Appeal**

Junior Prosecution Counsel alone. Defendant charged with attempted murder (stabbing). Defence was lack of intent / self-defence / 'mistake'. Defendant incorrectly concluded victim was a terrorist. Following submissions HHJ withdrew self-defence / mistake due to the defendant's admitted voluntary consumption of alcohol of drugs as the statutory meaning of 'attributable to intoxication' did not require the defendant to still have drugs / alcohol in his body. Conviction appeal considered before 5 appeal judges who reconsidered self-defence / intoxication. Conviction upheld. During the course of the case, I advised the CPS to obtain psychiatric evidence on the defendant, drafted legal directions on self-defence, intoxication and mistake, and drafted the respondent's notice in the subsequent appeal which is a leading authority.

- **R v J. Westminster Magistrates Court, Divisional Court & Central Criminal Court**
  Junior Prosecution Counsel. Defendant was a former MP charged with twenty-two historic sexual offences dating back to the 1960's in relation to nine complainants. The case involved 10s of thousands of pages of unused material and extensive records held by third parties. I supervised three other junior counsel instructed to review the material and to ensure the disclosure process was CPIA compliant. In addition, the defendant was declared unfit to stand trial and the case involved medical evidence from a number of medical practitioners.

- **R v SA. Liverpool Crown Court**
  Prosecution Counsel. Defendant charged with stalking and various Computer Misuse Offences.
  The Defendant was a Solicitor employed by the Crown Prosecution Service. The Defendant was alleged to have stalked their former partner over a period of 16 months causing them serious alarm and/or distress. The conduct included monitoring the complainant's movements, tracking the complainant's motor vehicle, monitoring the complainant's social media account, accessing personal emails/messages and other personal information, threatening to share/sharing highly personal information about the complainant and repeatedly attending an address knowing such attendance was unwanted. The complainant was a District Judge. The case involved thousands of emails/messages.

- **R v M & D. Central Criminal Court**
  Junior Prosecution Counsel led by Mark Heywood KC. Defendant charged with murder (stabbing) and perverting the course of justice. Victim was gender neutral. Murder took place during a 'sex and drug' binge. Case involved analysis of hair samples from both the victim's and the defendant's hair in order to determine what drugs had been consumed and whether either had a previous history of taking such drugs as the defendant claimed he had been inadvertently drugged by the victim. I presented the toxicology and forensic evidence during the trial, including DNA. I advised the CPS on all aspects of the forensic evidence.

- **R v I and 4 Others. Central Criminal Court and the Court of Appeal**
  Junior Prosecution Counsel led by Alan Kent KC before HHJ Smith. Five defendants (one only 14-years-old) charged with murder (stabbing). Case involved issues surrounding joint enterprise and identification. I presented the mobile telephone evidence during the trial, including cell site, that demonstrated a link between all five defendants and their movements to and from the scene of the murder. I also presented the pathological evidence relating the 15 stab wounds the victim sustained, including evidence as to whether it was possible to determine whether more than one knife had been deployed in the fatal attack. This case had sensitive issues of disclosure revolving around police intelligence. I liaised with the Dedicated Source Unit, the branch of police responsible for intelligence gathering.

- **R v CG. Isleworth Crown Court**
  Junior Prosecution Counsel led by Sally O'Neill QC before HHJ Edmonds QC at Isleworth Crown Court. Graham poisoned a child over a number of weeks with insulin. Child left with life changing injuries and will never be able to walk or talk.

- **R v DS. Central Criminal Court**
  Junior Prosecution Counsel led by Oliver Glasgow QC before HHJ Wendy Joseph QC at the Central Criminal Court. Sylva was convicted of the stabbing Britain's Got Talent finalist Simone Kerr to death in a violent rage. HHJ Wendy Joseph QC described the attack as "sustained and ferocious". Sylva was a 41 year old Iraq Veteran who stabbed Simone Kerr more than 70 times at his flat in Clapham, South London. Sylva admitted manslaughter claiming he was suffering was PTSD following tours of Kosovo and Iraq. This was rejected by the jury. Analysis of records held by the Army revealed that Sylva had previous history of offending against females and that on one occasion he had previously tried to kill his own mother in a similar violent rage.

- **R v Adam Yarro. Woolwich Crown Court**
  Prosecution Counsel before His Honour Judge Miller at Woolwich Crown Court. Defendant charged with a number of offences includes Robbery and Possession of an Imitation Firearm. The victim was Simon Jordan, the former owner of Crystal Palace Football Club. Yarro pulled up next to Simon Jordan at a set of traffic lights on a moped and forced an imitation firearm through his car window and demanded a watch from his wrist valued at approximately £135,000. Analysis of CCTV and ANPR records revealed that the watch had been 'sold' in the Hatton Garden Area within 60 minutes of the offence being committed. Case featured in BBC One documentary The Met: Policing London on the 3rd October 2019.


- **R v A. Wolverhampton Crown Court**
  Junior Prosecution Counsel led by Jonathan Rees QC before Mr Justice Baker. Sixteen-year-old Defendant charged with murder of 14-year-old girl in Wolverhampton park. Defendant required the services of an intermediary throughout the trial. Case involved a 'legal first' when I called evidence relating to the lifting of a digital fingerprint from a video, recovered from a mobile telephone, in order to link the deletion of material from a telephone handset to the defendant. Case also involved complicated pathology in order to determine whether the Victim was anally penetrated when she was dead / alive and the presence of semen from her stepfather in a pair of knickers recovered from the scene.

- **R v D and Others. Wood Green Crown Court**
  Junior Prosecution Counsel. Led by Brian O'Neill KC. 6 Defendants charged with murder involving a execution style shooting in broad daylight. Defendants ran cut throat defences blaming each other. Issues in the case centered around the presentation of CCTV, ANPR evidence re the movement of vehicles, phone attribution and cell site analysis. Jury were in deliberations for 119 hours before delivering verdicts. Principals sentenced to life imprisonment with a minimum term of 34 years.

- **R v KO. Central Criminal Court**
  Junior Prosecution Counsel led by Mark Heywood QC before Mrs Justice Cheema Grubb. Defendant charged with female genital mutilation (FGM). Case was only the second time a defendant has ever been prosecuted for FGM in the UK.

- **R v H. Harrow Crown Court**.
  Junior Prosecution Counsel led by Brian O'Neill KC. Defendant charged with murder (stabbing on way to school). Defendant and deceased were both 15 years of age at time of offence. Evidence included material re gang affiliation and postcode wars and the presentation of drill videos and imagery from social media (Instagram and Snap Chat). Significantly the prosecution were able to call evidence of the defendant's ability to make two bulk purchases of knifes on the internet that he provided to fellow gang associates. Defendant provided insight into how knives are stored on/around housing estates so individuals can arm themselves as and when the need arises rather than carrying them on their person.

- **R v P and Others. Central Criminal Court**
  Junior Prosecution Counsel led by Tom Little KC. Six Defendants. Police investigation initially concerned a young male who went missing however a murder investigation following when skeleton remains were discovered in woodland. Cause of death could not be established. Case involved extensive CCTV and Cell Site analysis that enabled the Deceased's movements in the days leading up to his disappeared being re-constructed. Case also involved blood pattern analysis, DNA and the evidence of an archaeologist re the Deceased's remains. Leading counsel has to withdraw during the trial due to ill-health. I cross examined 3 of Defendants and made the closing speech. Defendants convicted of murder and perverting the course of justice.

- **CPS v P. Westminster Magistrates Court**
  Prosecution Counsel. Prosecution of a serving Police Officer with the Metropolitan Police Service under the Malicious Communications Act 1988. Officer sent racist text messages to partner who also a serving police officer. Defendant made an application to stay proceedings on the basis that the DPP's consent had not been properly obtained and he had been deprived of the opportunity of reviewing the complainant's full download. Defendant convicted.

**ADVISORY**

- Counsel to Sir Richard Henriques and instructed by the Crown Prosecution Service to conduct an independent and thorough review into the CPS decision-making and handling of all past allegations made against Lord Greville Janner in 1991, 2007 and 2012 and to make recommendations as to how such allegations should be prosecuted in the future. I worked with the DPP on a daily basis during this review.

- Counsel to Sir Richard Henriques and instructed by the Metropolitan Police Service that reviewed and reported upon the conduct of the Metropolitan Police Service in investigating allegations of non recent/historical sexual offences said to have been committed by prominent public individuals (including the former Head of the Army, Lord Bramall, the former Home Secretary, Leon Brittan, the former MP, Harvey Proctor, and a number of celebrities from the radio and television) with a view to identifying any possible errors or failures on the part of the Service and to making recommendations as to the future conduct of any such investigations.

### CCRC REFERENCES

- ***R v. Peter Tredget***
  Junior Prosecution Counsel led by Richard Whittam QC in response to the CCRC's referral of serial arsonist Peter Tredget who was jailed for life after admitting killing 26 people. The attacks occurred in the 1970's. The appeal involved a review of a series of fatal / non fatal homicide investigations, the treatment of the Appellant in police custody and a review of authorities in which a defendant can appeal a convictions following a plea of guilty.

- **R v Gordon Park**
  Junior Prosecution Counsel led by Richard Whittam QC before Lady Justice Sharp, Mr Justice Sweeney and Mrs Justice May in response to the CCRC's Referral of the "Lady in Lake" case, which was one of the UK's longest, murder enquires. The CCRC cited the cumulative effect of a number of issues, including the non-disclosure of expert opinion undermining the prosecution's assertion that Gordon Park's climbing axe could be the murder weapon, new scientific evidence showing that Gordon Park was not a contributor of DNA preserved within knots of the rope used to bind his wife's body, non-disclosure of information undermining the reliability of a prosecution witness who gave evidence of a prison confession and a renewed assertion that a rock found in the lake near Carol Park's remains could not specifically be linked to rocks at Bluestones, the family home, should be reassessed. The Appeal involved the instruction of forensic scientists, forensic pathologists and forensic odontologists and a review of legal, dental and medical records going back to 1976.

- **R v Alan Charlton and Idris Ali.**
  Junior Prosecution Counsel led by Richard Whittam QC before Lady Justice Hallett, Mr Justice Nicol and Mr Justice Coulson. The case became known as the 'body in the carpet' case after the remains of a 15 year old girl were discovered wrapped in carpet in a shallow grave a stone's throw from the Millennium Stadium on 7 December 1989. The CCRC raised concerns about the alleged 'oppressive handling' of witnesses by police officers and alleged breaches of the Police and Criminal Evidence Act 1984. In particular, the CCRC drew comparisons between the involvement of 23 key police officers from South Wales who were involved in investigating the murders of Phillip Saunders and Lynette White and who were ultimately charged with perverting the course of justice relating to those convictions. The Court of Appeal accepted the respondent's submissions on the law and the approach to be taken in cases where there was proven misconduct of police officers in other cases. Appeal dismissed.

- **R v Kevin Lane.**
  Junior Prosecution Counsel led by Richard Whittam QC before Lady Justice Rafferty, Mr Justice William Davis and Mr Justice Inman. Lane was jailed for life in 1996 for the murder of Robert Magill who was shot dead by a hitman in Hertfordshire in 1994. The CCRC's referral concerned evidence of police corruption and the convictions of a detective who played a major role in original police investigation. Appeal dismissed.

### APPOINTMENTS

- **Appointed by the Attorney General as Senior Treasury Counsel from 1 April 2024.** Treasury Counsel are a team of specialist advocates who prosecute many of the most serious and complex cases in the country, and advise and appear on behalf of the Law Officers, and other government departments.
  https://www.cps.gov.uk/cps/treasury-counsel

- Monitored for Treasury Counsel between July 2015 and December 2017.

- Appointed Grade 4 CPS Panel Advocate.  Appointed at the highest level to prosecute cases of homicide.

- Appointed Grade 4 Advocate on the CPS Serious Crime Group Panel. Appointed at the highest level to prosecute cases involving serious crime.

## CONTINUING PROFESSIONAL DEVELOPMENT

- Pupil Supervisor.  Provide ongoing training to pupils in chambers.

- Completed the Bar Council's Equality and Diversity Awareness Training Programme.

- Completed the Bar Council's Fair Recruitment and Selection and Training Programme.

- Completed the Middle Temple Advocacy and Vulnerable Witness Training Programme.

- Provides training to the Crown Prosecution Service and Metropolitan Police Officers in the harvesting, review and recording of CCTV and DNA evidence

## DIRECTORIES

I am shortlisted at the Legal 500 Bar Awards 2024 for Crime and Extradition Junior of the Year.

What the Directories Say:

- "Louise is an exceptional lawyer in terms of her knowledge of the law and her ability to draft a legal argument and deliver it orally." Chambers UK 2024

- "She is meticulously prepared and her witness handling skills are just absolutely first class." Chambers UK 2024

- "A real star on the prosecution side, whose capacity for work is incredible. She's incredibly straight talking and her judgement is impeccable." Chambers UK 2024

- "Louise is exceptional. She is hard working, intelligent, articulate and utterly charming. She is universally respected and liked. She is destined for the very top." Legal 500 2024

- "A great cross-examiner who is always all over the facts in a case." Chambers UK 2023

- "Louise is calm under pressure, collected in the face of hostile opponents, and completely in command of her brief. A real star." Legal 500 2023

- "She is Just Fantastic" Chambers UK 2020