LATHAM & WATKINS LLP
  Marvin S. Putnam (Bar No. 212839)
    *marvin.putnam@lw.com*
  Laura R. Washington (Bar No. 266775)
    *laura.washington@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Telephone: +1.424.653.5500
Facsimile: +1.424.653.5501

*Attorneys for Defendants*
Netflix, Inc., and
Netflix Worldwide Entertainment, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIONA HARVEY,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>NETFLIX, INC., and NETFLIX WORLDWIDE ENTERTAINMENT, LLC,<br><br>　　　　　Defendants. | Case No. 2:24-cv-04744-RGK-AJR<br><br>**DECLARATION OF LAURA WRAY IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE**<br><br>Date:　　September 3, 2024<br>Time:　　9:00 a.m.<br>Place:　　Courtroom 850<br><br>Hon. R. Gary Klausner |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
DECLARATION OF LAURA WRAY IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

# DECLARATION OF LAURA WRAY

I, Laura Wray, declare as follows:

1. I am a solicitor admitted to practice law in Scotland. I was a partner at the law firm L & L Lawrence Solicitors for eleven years between 1987 and 1998, after which I became a Consultant to Drummond Miller until 2003. I also qualified in English law in 1992. I was elected to the Executive Board of the Association of Personal Injury Lawyers ("APIL") in the 1990's and served on it for several years. I am currently an Advocate at the Faculty of Advocates (having been called to the bar in 2003), an independent body of lawyers who have rights of audience in the highest courts in Scotland. I have been practicing as an Advocate for twenty-one years, specializing in personal injury, medical negligence and product liability cases. I also sit on several boards (pro bono) assisting severely disabled children and young people.

2. I have personal knowledge of the facts set forth below and, if called as a witness, could and would testify competently thereto for the purpose of this motion. I submit this declaration in support of defendants Netflix, Inc., and Netflix Worldwide Entertainment, LLC's special motion to strike.

3. I am the widow of James "Jimmy" Aloysius Joseph Patrick Gabriel Wray, a longtime Scottish politician and Labour Member of the House of Commons at Westminster in London, the House of Parliament which contains the elected representatives of the United Kingdom (colloquially known as an "MP"). Jimmy served as an MP for eighteen years and stepped down in 2005 due to health issues. He also served on the Council of Europe (part of the European Union). During his time as an MP, Jimmy was a well-known figure across the United Kingdom and Europe, particularly for his commitments to countering poverty, drug abuse, and crime. He was particularly known for introducing what was described as the 'Knives Bill', a piece of legislation to tackle knife crime. Jimmy and I were married for thirteen years, though we separated in 2009, and he died in 2013.

2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
DECLARATION OF LAURA WRAY IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

4. As stated above, I was a lawyer in private practice and was a senior partner in the firm of L&L Lawrence Solicitors who specialized in personal injury and trade union work. Fiona Harvey sent me several letters, in very familiar terms as if I knew her, asking to come and join my firm. She also sent me a congratulations card when I got engaged to Jimmy in 1997. Due to Jimmy's prominent position in politics, our engagement received press coverage. I assumed I must have known Ms. Harvey from somewhere and agreed to interview her.

5. In 1997, Ms. Harvey started work as a trainee solicitor at my law firm, L & L Lawrence Solicitors. I gave Ms. Harvey a trial period as a trainee commencing on October 13, 1997 but had to terminate her employment after two weeks due to her inappropriate behavior. During this two-week period, Ms. Harvey was rude to staff, rude to a severely disabled client (suggesting to him that people made fun of him because of his disability), shouted at people, made inappropriate advances toward a male colleague in the office and attempted to follow him home from work, and on one occasion threw a book which hit someone in the office. She would also direct prospective clients who called our accident advice help line to other solicitors who were our competitors, which sabotaged our business. When I told her that I was terminating her employment, she refused to leave. She started shouting, screaming, and running around the office. Eventually, she had to be physically marched out of the office by me and my cashier. She then stood outside the office screaming abusive things for about half an hour. My staff were extremely alarmed by this behavior.

6. Following the termination of her employment, Ms. Harvey launched a five-year harassment campaign against me and my family.

7. Ms. Harvey left numerous voicemails on the office answering machine daily, making false accusations against me and threatening her revenge. Ms. Harvey said, "I'll get you" and "I'll get Jimmy Wray." These statements were made in a very threatening manner. Ms. Harvey's harassment of the office was so severe that

1  I was forced to issue my staff with panic alarms in case they were assaulted by her.
2  We would notice her driving around outside the office for hours.  My staff were
3  terrified of her.

4        8.    On October 31, 1997, I wrote a letter to the Law Society of Scotland to
5  express my concerns regarding Ms. Harvey's behavior.  This letter noted that
6  "myself, Ross Pilkington my Associate and my fiancé Jimmy Wray MP have been
7  the subjects of threats by Fiona [Harvey] and she has apparently sent a copy of a
8  defamatory letter about myself and my firm to Donald Dewar and Norman Godman
9  MP."  In this letter, I informed the Law Society that I was "seriously worried about
10 the threats" and that I had issued my staff panic alarms.  I also included a chronology
11 which detailed all of Ms. Harvey's stalking and harassment behavior thus far.
12 Attached hereto as **Exhibit 1** is a true and correct copy of the October 31, 1997 letter
13 to the Law Society and the attached Chronology of Events.  On November 6, 1997,
14 the Law Society responded to my letter, noting "I am disappointed that after taking
15 so long to find a traineeship, Fiona has managed to lose not just one but two such
16 places in a very short period of time.  The account of her behaviour which you have
17 given certainly justifies the expression "bizarre" . . . it does seem from what I have
18 heard that Fiona is not cut out for the legal profession."  Attached hereto as **Exhibit
19 2** is a true and correct copy of the November 6, 1997 letter from the Law Society.

20       9.    On February 11, 1998, Ms. Harvey wrote me a handwritten letter and
21 sent me a fax, stating that a reference to Anniesland Job Center regarding her
22 dismissal came to her attention on February 9, 1998.  In the reference, I was asked
23 to explain why Ms. Harvey was dismissed from L & L Lawrence Solicitors, and I
24 explained that her dismissal was due to "rudeness, difficult behavior with staff and
25 myself, sabotaging our business by referring potential clients to other firms of
26 solicitors and acting in a completely unprofessional manner.  Since dismissal[,]
27 myself and other members of staff had had to put up with threats and . . . abuse from
28 Miss [Harvey] and we have had to inform the Law Society and the police."  Ms.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
DECLARATION OF LAURA WRAY IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

1  Harvey's letter and fax threatened me that if I did not send her a "written guarantee"
2  that I would not convey the substance of the reference to any potential employer,
3  Ms. Harvey would "have no option but to take legal measures" against me. She
4  stated that she had consulted a "top firm of employment lawyers" and that I could
5  "do without a legal wrangle with [her] on top of the ongoing litigation" I had to
6  "contend with." She also stated that "[p]eople are obviously interested in the press
7  coverage" regarding my firm, but she had refrained from making a comment,
8  seeming to threaten that she would go to the press if I did not obey her demands. In
9  response, on February 13, I informed Ms. Harvey that I was obliged by law to reply
10 to the Job Center and that I would "not be blackmailed" by her into agreeing the
11 wording of a reference to a future employer in return for her not taking legal action
12 against me. I also stated that I hoped this was the last occasion I heard from Ms.
13 Harvey—unfortunately, this did not happen. Attached hereto as **Exhibit 3** is a true
14 and correct copy of the Job Center reference, Ms. Harvey's fax and handwritten letter
15 dated February 11, 1998, and my response dated February 13, 1998.

16     10.    Ms. Harvey called several of the firm's clients to make derogatory and
17 untrue remarks about me. She also sent faxes disparaging me to other law firms. On
18 multiple occasions, Ms. Harvey contacted the MacPhail Lawrence Partnership, the
19 successor firm of L & L Lawrence Solicitors (and which was owned by Drummond
20 Miller) to which I was a consultant and verbally abused me in her letters and phone
21 calls. On June 3, 1999, Ms. Harvey called MacPhail Lawrence Partnership and told
22 them "Laura is a lazy rat and sits on her backside doing nothing. It's a joke, she was
23 taken on in this firm in the first place. I am fizzing and I am going to take strong
24 action." On the same day, Ms. Harvey wrote a letter to David Wilson at the
25 MacPhail Lawrence Partnership, which made insulting comments about my husband
26 and our wedding. Attached hereto as **Exhibit 4** is a true and correct copy of the June
27 3, 1999 letter to Mr. Wilson.
28

5

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
DECLARATION OF LAURA WRAY IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

11. On September 22, 1999, Ms. Harvey wrote another letter to Mr. Wilson claiming that I was "staring at [her] in the street" and falsely accusing my husband of "wife battering." Attached hereto as **Exhibit 5** is a true and correct copy of the September 22, 1999 letter to Mr. Wilson.

12. Ms. Harvey made threats against me and my husband. She bombarded me with threatening phone calls saying, "I'll get you," and threatened my husband, stating "Jimmy Wray will rue the day" in several voicemails.

13. On January 30, 2000, The Sunday Mail reported Ms. Harvey's stalking and harassment of me and my family under the headline *MP Wife's Stalker; Lawyer Laura Tells of Fired Trainee's Hate Campaign*. Attached hereto as **Exhibit 6** is a true and correct copy of the January 30, 2000 Sunday Mail publication.

14. The next month, Jimmy appeared in the Court of Session in relation to a defamation action he was pursuing against the newspaper, *The Mail on Sunday*. This lawsuit was completely unrelated to the articles that detailed Ms. Harvey's stalking of me and my family that appeared in The Sunday Mail publication. Nonetheless, Ms. Harvey left a voicemail on Jimmy's Parliamentary phone threatening that if we showed up to the hearing, she would kill Jimmy and me. At this time, Jimmy and I became even more concerned and contacted the Glasgow police to report these death threats. In response, the police told us that there was nothing they could do unless Ms. Harvey physically harmed us. At the same time, I also contacted Bruce Ritchie, the Director of Professional Practice at the Law Society of Scotland and passed on my concerns about Ms. Harvey's escalating behavior. On the first day of the hearing in the Court of Session, I was very anxious and concerned about what Ms. Harvey would do or say. Mr. Ritchie called me to inform me that Ms. Harvey had informed him that she had intended to come to the hearing that day, but "was too busy."

15. Around September 2001 Jimmy and I were contacted by the office of John Robertson MP, another Scottish Member of Parliament at Westminster, who

was concerned by a message left on his answerphone by Ms. Harvey to the effect that she had had enough and was now going to kill Jimmy.

16. On November 20, 2001 I wrote to the Law Society of Scotland to express my concerns about Ms. Harvey and which detailed some of the information set out above. Attached hereto as **Exhibit 7** is a true and correct copy of the November 20, 2001 letter to the Law Society. I have redacted a passage from that letter in which I referred to a rumour I had heard about Ms. Harvey which contained a very serious allegation about her. Given that I do not know whether this rumour was true or not I do not wish to refer or rely on it and would rather confine my declaration to the facts and matters which I know to be factually accurate.

17. Around the same time in 2001, I started a course at the University of Strathclyde to obtain additional qualifications with a view to being called to the bar to become an Advocate. On the first day I arrived to matriculate at the University I noticed Ms. Harvey in the admin lobby. I don't know whether that was a complete coincidence or not but I became aware from the University that she was not actually properly enrolled as a student there. On the first day of classes, I saw Ms. Harvey sitting in the classroom and staring at me across the room. She continued to show up to my lectures and stand beside me as students waited for the lecture room doors to open. I was frightened and had to ask some of the other students to walk me to my car after class.

18. I went to speak to a professor (Professor Norrie, who was head of the Law School) and explained what had been happening, and he confirmed that Ms. Harvey was not registered as a student, but the university ultimately did not take action. Later, the university contacted me to apologize and advised that she had been permanently banned for her behavior toward other students and staff. This is recorded in a letter from Professor Norrie dated June 10, 2002 and I attach hereto at **Exhibit 8** a true and correct copy of that letter.

19. On April 23, 2002, Ms. Harvey made a false report to authorities stating that my husband and I were mistreating our son Frankie who suffers from a rare chromosomal disorder and is severely disabled, being unable to walk properly or feed himself, with no speech, double incontinence and partial sight (he is now blind). I was aware from another former employer of Ms. Harvey who had contacted me some time before this that, after they had fired her, she reported them to the social work authorities for abusing their children. This accusation was initially taken very seriously but was completely untrue. This caused huge distress to them. Against that background, when two social workers appeared at our home (after I had complained to Professor Norrie) and explained that a student who was at University with me had claimed we hit our son, I immediately suspected it was her and the social workers eventually confirmed this to me. I was told by the social work department that she went on to make a total of five complaints to them demanding, in increasingly aggressive terms, that they should take my son into care. Even though the social work department took no action over these complaints, which they deemed to be malicious and untrue, this was still deeply upsetting and traumatizing to me. An article was published about these incidents at the time on April 28, 2002 in The Sunday Mail titled *"Sick Stalker Targets MP's Disabled Son."* Attached hereto as **Exhibit 9** is a true and correct copy of this article.

20. The continuing harassment from Ms. Harvey, culminating in her false report to the authorities that my husband and I were mistreating our child and the resulting publicity from that false report, pushed me to obtain an Interim Interdict against Ms. Harvey, which is essentially a restraining order.

21. I had contacted the police in Scotland about Ms. Harvey stalking me on several occasions between 1997 and 2002, but they did nothing, which was why I was forced into obtaining the Interim Interdict myself. At that time it was my clear impression that 'stalking' was not taken seriously by the police in Scotland. Most cases involving stalking and harassment took place in the arena of domestic abuse

and the police did not want to get involved and usually told women they had to go to the civil courts for a remedy which many could not afford to do. My case was highly unusual in that it involved one woman stalking another, and it was not taken seriously at all.

22. 'Stalking' was considered to be an offence which fell under the umbrella of, and was labelled in Scotland as, "Breach of the Peace", which is a minor catch-all offence in Scotland. "Breach of the Peace" would cover situations where someone got into a verbal argument in a pub after having a few drinks, or football fans shouting at each other i.e. relatively minor offences. This did not at all reflect the seriousness of what Ms. Harvey did to me and the other victims who have contacted me about their experiences at the hands of Ms. Harvey. I think this is a sad reflection on the criminal justice system in Scotland rather than any kind of acknowledgment that Ms. Harvey's stalking behaviour is or was acceptable or a minor offence.

23. Attached hereto as **Exhibits 10 and 11** are true and correct copies of the Initial Writ for Interim Interdict and corresponding Court Order that I obtained and which was issued on April 29, 2002. A fax on April 29, 2002 from my solicitors confirmed that the Interim Interdict was granted. Further correspondence between Ms. Harvey and my solicitors on May 16, 2002 confirmed that she had received the Interim Interdict. Attached hereto at **Exhibits 12 and 13** are true and correct copies of this correspondence.

24. On March 3, 2004, the Daily Record published a piece titled "*I've Got a Long Wrray [sic] to Go Yet; MP Jimmy talks for the first time about his stroke, his family, and the condition that blights his littleboy's [sic] progress*". In the interview, my husband speaks about his recent stroke and our son's condition, which included a reporting on Ms. Harvey's false report to social workers and the Interim Interdict we obtained against her. Attached hereto as **Exhibit 14** is a true and correct copy of the March 3, 2004 Daily Record publication.

25. I did not hear from Ms. Harvey after I took the Interim Interdict in 2002 until I was identified by the press around the end of April 2024 as being a former victim of hers, after the *Baby Reindeer* series had launched on Netflix. As soon as my identity was revealed in connection with her, Ms. Harvey began making abusive and defamatory posts on Facebook about me and making threatening remarks. Attached hereto as **Exhibit 15** is a true and correct copy of the Facebook posts.

26. I then saw her interview with Piers Morgan on *Piers Morgan Uncensored*, in which she mentioned me by name and denied having stalked me. Ms. Harvey claimed that she resigned from L&L Lawrence Solicitors and that she only contacted the law firm to complain about how she was treated. This false account of my harrowing experience with Ms. Harvey brought back much anxiety along with the fact that Ms. Harvey has started harassing me again online. She said on the interview that I headhunted her from another firm and that she was an employment specialist. She said that I did not know the name of my own firm. She said she 'walked' from my firm. She said that she has never had any legal proceedings or restraining orders against her from me whilst at the same time conceding that I did take legal proceedings against her but 'mucked up' the paperwork. She said she was going to take a 'countrywide' Interdict against me and my husband in the Court of Session. She said the Sunday Mail story about her stalking me was untrue and that as a Labour Party member I made this up to undermine her seeking selection as a Parliamentary Candidate. None of this was true.

27. There was no chance of her being selected as a Parliamentary Candidate, not least due to her behaviour at a selection meeting reported by the Herald on September 5, 2000 (attached hereto as **Exhibit 16** is a true and correct copy of the Herald article). She was never on any list of approved candidates. Nor was I ever a Labour Party member.

28. The defamatory sting of what she said about me personally was that I am a liar and incompetent lawyer and which is why I wanted a right of reply on Mr. Morgan's programme, which I felt was the only way I could get my point across even though I am fearful of Ms. Harvey.

29. A month or so ago my partner received a phone call from someone he knows who lives in a village near us who told him that journalists were going round the doors in the village because they had been tipped off that Ms. Harvey was looking to purchase a home there. I then spoke to the person who made the call—he confirmed to me that she had put in an offer for a property but that it hadn't been accepted.

30. I have always felt threatened by Ms. Harvey because I never knew what she was capable of. She threatened to kill me and my husband on several occasions.

31. As I said, I am fearful of Ms. Harvey, but felt compelled to come forward and submit this declaration. Ms. Harvey claims that she did not stalk and harass Richard Gadd and has no history of stalking and harassment. But I know that she stalked, threatened, and harassed me and my family for years and has continued to do so more recently on her Facebook pages. I have been contacted by a number of individuals since Baby Reindeer aired and after my interview on *Piers Morgan Uncensored* to say that she stalked and harassed them too. These individuals have told me that they are afraid to come forward because they are terrified of what Ms. Harvey may do, particularly if she receives any compensation from Netflix.

32. I have also been aware that she stalked a number of politicians, in particular she stalked Donald Dewar (now deceased, the former First Minister of the Scottish Parliament) which I discussed with him, and George Galloway who has since come out and spoken publicly on *Piers Morgan Uncensored* about his experiences with her and who had also spoken to me about his experiences with her. I am also aware that she harassed John Robertson MP, who became her local MP, based on conversations I had with him.

11

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Case No. 2:24-cv-04744-RGK-AJR
DECLARATION OF LAURA WRAY IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 26, 2024 in Scotland, United Kingdom.

_____
Laura Wray

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

12

Case No. 2:24-cv-04744-RGK-AJR
DECLARATION OF LAURA WRAY IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE