# EXHIBIT 1

EXHIBIT 1
Page 13

Our Ref:    MRS L WALKER/MJ

Your Ref:

Friday 31 October, 1997

Mr. Bruce Ritchie
THE LAW SOCIETY OF SCOTLAND
DX ED1
Edinburgh

Dear Bruce,

**Re:       FIONA MUIR - TRAINEE**

I am sorry to trouble you once more on this matter but I have enclosed a copy of a Chronology of Events so far. As you can see both myself, Ross Pilkington my Associate and my fiance Jimmy Wray MP have been the subjects of threats by Fiona Muir and she has apparently sent a copy of a defamatory letter about myself and my firm to Donald Dewar and Norman Godman MP.

I had hoped that all of this would die down without me requiring to take any action but I am most concerned about the situation. I appreciate The Law Society has no real locus over Fiona but I wanted to bring matters to your attention and to ask you for your advice.

As I am seriously worried about the threats that have been made I have taken the precaution of issuing all the staff with panic alarms in case they are approached.

Clearly Miss Muir thinks she can write and say anything she likes about me and the firm on the basis that as she has no assets I would not be likely to sue her for defamation. Her behaviour has been so bizzare that I doubt an Interdict would make any difference if she decided that she was going to carry out any of her threats.

As a solicitor I have a duty to the profession and indeed to the public to ensure that unsuitable people are not admitted as solicitors and although I would not wish to deprive a young person of their career I have to say that it is my opinion that she is not fit to be a solicitor and I would go as far as to say I believe this girl is mentally ill.

EXHIBIT 1
Page 14

I would appreciate your advice and perhaps you would be good enough to give me a call when you have had a chance to look over the papers.

Yours sincerely,
L.& L. LAWRENCE
Per:

EXHIBIT 1
Page 15

# CHRONOLOGY OF EVENTS

## REGARDING FIONA MUIR, TRAINEE

Wednesday, 8th October, 1997

I met Fiona Muir today to discuss a potential Traineeship. I explained to her that we had not been considering taking on a Trainee at this point but that our workload meant that it was a possibility. Miss Muir said that she was working with a Graham Sykes of Sykes & Company doing conveyancing and that Mr. Sykes had not signed her Training Contract although she had been with the firm for 8 weeks. She expressed certain reservations about Mr. Sykes firm and said that she did not like the staff and that what she really wanted to do was Employment Law and/or Reparation. She explained that she had got to a second interview with Mackay Simon in Edinburgh but had not actually got the job.

She seemed reasonably plausible and enthusiastic. She gave me a bit of a hard luck story about her family background and basically said that nobody had ever really given her a chance to make a go of things. She said that Sykes & Company were taking advantage of her because they were not even paying her the full going rate as a Trainee.

A few days before the meeting she had even sent me a card congratulating me on my engagement to Jimmy Wray MP.

I offered her a Traineeship and asked her when she would like to come and join us. She said she thought there might be a bit of a scene at Sykes office and that they would not be happy about her leaving and I told her to telephone me later on to let me know when she would be able to join us.

She did phone me later in the day to say that she would come and join us on Monday, 13th October.

Monday, 13th October, 1997

Fiona Muir joined us, was introduced to the staff and was given a desk in the area where we deal with motor claims.

Tuesday, 14th October, 1997

I was over in Edinburgh as I had a Proof in the Court of Session. Our Practice Accountant,

1

EXHIBIT 1
Page 16

Carol-Ann telephoned me to say that Fiona had come in and asked her for a "sub" and told her she wanted her wages paid in cash. Carol-Ann explained that it was not our practice to give any staff a sub or to pay wages in cash and Carol-Ann expressed surprise to Fiona that she would ask for something like this when she had only been with us a day. I said to Carol-Ann that I would not mention it to Fiona as I did not wish the subject to be up again for discussion and I did not want to embarrass Fiona.

### Wednesday, 15th October, 1997

I was working in my office in the afternoon when Fiona burst through the door in a frantic state. I asked her what was wrong and she said that there was a man in Reception who would not leave until she paid him for a repair to her car. I asked her what this had to do with me. Her response was that she did not have enough money to pay for the repair as she had borrowed money from her Aunt but when she had looked at the money there was not actually sufficient for the bill. She was tearful.

She started to explain that she had all sorts of financial difficulties and said that she wanted a "sub" on her wages. I said that this was not the kind of thing that we did and that I knew she had asked the previous day and been told no and that I was surprised that she was asking once again. I said I did not want to encourage other members of staff to ask for "subs" on their wages but that I would help her personally. I ascertained from her that she had approximately £200 and the repair was approximately £250 and that she had no money whatsoever to live on until she would get paid 3 weeks later. I said that I would personally pay for the car repair out of my own pocket and that she should use the remaining funds that she had to keep herself going to the end of the month. She then went off to pay the man from the garage and then came back up to my room again after that.

We had a long discussion about Fiona's financial affairs and she told me personal details of her family life as an explanation why her parents would not be prepared to assist her in any way. She explained that she had taken out various loans when she was a student and thereafter to enable her to look for legal work and that she had got into financial difficulty. She was a bit vague on the details but gave me a copy of a letter from the NatWest Bank wherein the bank manager stated that she had betrayed their trust in not telling them about other loans that she had outstanding. Fiona was very tearful and upset. I said to her that if she wanted me to I would be prepared to go and speak to her bank manager and see if we could make any proposals which would keep them off her back and enable her to concentrate on her Traineeship. She said she would be grateful if I would do this.

I was in London on the 16th, 17th and 18th of October and in Edinburgh on Monday the 20th October and did not have a chance to phone her bank manager. Eventually I contacted the bank manager, Malcolm Smith and arranged to meet him at 2.30 p.m. on Thursday the 23rd of October.

<u>Thursday, 23rd October, 1997</u>

I met with Malcolm Smith at NatWest Bank. I was with him for approximately an hour and a half. He seemed to be a very nice man who was keen to help and although the repayment Fiona had agreed to make to them was £136 per month he agreed that if a regular payment was being made, preferably direct from ourselves on Fiona's behalf, then the bank would accept £30 per month in the first year and that this would be reviewed every year so that as her salary and ability to pay increased the repayments would increase so that she could eventually free herself of the debt. He said he was worried about the other banks and what attitude they might take as the list I had prepared of Fiona's income and expenditure indicated that her budget would have to be very tight to enable her to live. I said to Mr. Smith that I would liaise with the other banks and see what arrangements we could come to and that I would telephone him in a few days.

I returned to the office and told Fiona the content of the conversation I had with the bank manager. She immediately volunteered that she had spent the afternoon on the phone to Bruce Ritchie at The Law Society discussing whether she would be able to get her Practising Certificate if she simply went bankrupt. I told her this was a stupid thing to do as I thought it highly unlikely she would obtain a Practising Certificate having gone bankrupt and that this would make life very difficult for her in years to come if she ever wanted to enter a partnership, and that since the banks were prepared to be reasonable there was absolutely no necessity for bankruptcy. I also said I was surprised that she would make such an inquiry when at the very same moment I was personally using my time trying to negotiate her out of her difficulties.

At one point as I explained what the bank manager had said, she snapped "you're repeating yourself" - I expressed surprise she should respond in this way and that I found this a cheeky remark. She said she had not meant it in that way and didn't understand what I meant. I did not press matters but said to her that I thought it might be a good idea to sell her car since it is a 10 year old Panda and clearly a liability, and that this would give her some additional cash to keep going and reduce her outgoings. I said that I had mentioned this to the bank manager and told him that I would discuss this with her and that both he and I were concerned that her finances were so tight that if the car broke down again she would simply be back to square one and the bank had made it clear there was no chance of her getting an overdraft with them.

At this point Fiona hit the roof. She started screaming and shouting and crying and became quite hysterical. I was completely taken aback at what seemed to be a total change of personality and I was not able to calm her down. She started to laugh manically and began to berate the bank manager saying that what he didn't know was that her boyfriend had lost his job and that the bank wouldn't be getting any more money off him. I said to her I was a little concerned about her attitude towards financial matters and that as a lawyer she could

3

EXHIBIT 1
Page 18

not look at things in this way and that she had to face up to her responsibilities and that everyone was bending over backwards to help her. She then ran out of the room crying and I am told that thereafter she went to my Associate Ross Pilkington's room to cry on his shoulder and started to tell him all sorts of things about her family which Ross thought were of an intensely personal nature and which he did not wish to hear.

Friday, 24th October, 1997

As I had been concerned by Fiona's behaviour on the previous day and as I require to obtain references in respect of all my staff for the purposes of our Fidelity Insurance Policy I telephoned Graham Sykes who was Fiona's previous employer. He was not there and I left a message for him to call me.

I had to see clients in our Edinburgh Office and was hosting a joint meeting for APIL (Association of Personal Injury Lawyers) and AVMA (Association for Victims of Medical Accidents) at the Scandic Hotel, Edinburgh.

I received a call mid-morning from Carol-Ann my Practice Accountant to say that there had been some terrible scenes in the office that morning involving Fiona Muir. She had shouted at Graham Dunlop my assistant who had been trying to help her with a testing clause and she apparently said to him in front of a number of people at the top of her voice "don't you ever speak to me like that in front of people again!". Graham is a quiet mild mannered young man and he was somewhat taken aback. She had also shouted at Karen who is one of my secretaries and demanded that Karen do a piece of her work immediately and drop everything else she was doing for me.

I was advised by Carol-Ann that Fiona had stormed into Ross Pilkington's office room and announced that she had "period pains" and was going home. At around the same time however another member of staff overheard her saying that she had had a call from Graham Sykes office that I had been in touch with them and that she was angry about this and was going straight round there to sort them out. She left the office.

About an hour and a half later Carol-Ann phoned me back to tell me that Fiona had reappeared at the office and was overheard to say to someone on the phone that she had been round at her bank and that the bank manager had told her to "get her backside back into the office". Carol-Ann advised me that she had then announced she was coming with Graham Dunlop my assistant to the joint APIL/AVMA meeting in Edinburgh.

I was concerned about this as I did not want her arriving at an important meeting and causing a scene. I was not in a position where I could speak to her at the meeting as there were a number of important people there from England and many senior Scottish solicitors.

4

EXHIBIT 1
Page 19

<u>Monday, 27th October, 1997</u>

I met with Carol-Ann and Ross to discuss the events of Friday and to decide on the best course of action.

I was advised by Ross that in addition to the mood swings, rudeness and difficult behaviour with the staff she had also behaved unprofessionally with regard to clients. We market our Personal Injury specialisation throughout Scotland and Fiona was well aware of this. However when a potential client had phoned from Aberdeen having sustained serious injuries as a passenger in a taxi she had been heard to say that that was not the kind of work that we did and advised the client to go to David Burnside in Aberdeen who is one of our competitors and gave them his phone number. She had also not properly recorded about 20 cases on our marketing database. Ross also advised me of another incident where he was having to tread carefully with a difficult client. Fiona tried to take the phone off Ross who was speaking to this client as she said that she wanted to "sort him out".

I called Fiona in to see me and explained to her that I did not feel things were working out and in the circumstances I could not extend a Traineeship to her. I explained my reasons for this in tactful fashion but once again, she hit the roof. She said that she would make me pay for this, that the staff were all useless and that she had been told by various people she named, but who I have never heard of that, she ought not to come and work for us.

I asked her specifically about the incident involving the client in Aberdeen and she said Ross was making this up. I went into more detail about it and she said "He's lying. Oh alright I did it". I expressed the view to her that her conduct was less than professional. I said to her that I would pay her a full month's wages even though she was only due 2 weeks wages and that she could keep the loan I had already made to her. She refused to give me her National Insurance number so that we could not fill in any of the relevant paperwork. She then ran from my room screaming that she was not going to leave and that she was calling The Law Society.

She went to Ross Pilkington's room and started to phone the Law Society number. I followed her with Carol-Ann the Practice Accountant and said to her that she was making a scene and I would rather she simply leave quietly and I put the phone down. She then went into the room which she shared with a number of other staff and started shouting again making comments about me, about how useless the other members of staff were, how much everybody in the legal world disliked me personally etc. She then in front of myself, Ross, Carol-Ann and three others threatened my fiance shouting "Jimmy Wray will rue the day". She demanded at the top of her voice to know why it was that assistants left the firm and I said to her that people leave for all sorts of reasons including career development and I was not clear what her point was. She proceeded to stuff various books into plastic bags and to scream and shout. Some of the girls in the office were shaking and upset and thought that

5

**EXHIBIT 1
Page 20**

she was going to attack myself or some of the other staff physically.

Carol-Ann and I escorted her to the door where she once again started to scream and shout abuse at me. She kept saying she was not going to leave until I gave her back the papers that she had given me regarding all her debts with the various banks but even when I gave this to her she still was not keen to leave. Eventually she did go.

Then about 10 minutes later she telephoned me saying that I still had her Training Contract and she wanted it back. I said to her I would post it out to her First Class that night and I did. Later in the day she was spotted circling the office in her car.

Tuesday, 28th October, 1997

Fiona had left a message on the answerphone at the office which was to the effect that she could be contacted at Levy & McRae through Bill Macreath. She requested that we send the car accident claim that we were dealing with on her behalf to Levy & McRae and said that 2 text books were missing and that she wanted them and her Entrance Certificate to be sent to Levy & McRae. I had already sent the Entrance Certificate to her the previous day.

Then around mid-morning Reception called to tell me that Fiona Muir wanted to speak to me and was in the office. I asked Carol-Ann my Practice Accountant to go down and bring her up to my room.

I got a call from Carol-Ann saying that Fiona Muir did not now want to see me in person. I went down to Reception where Fiona thrust the wages cheque I had given her in my face. She demanded that I give her cash as she said she would not be able to cash the cheque. I said that this was not my problem and it was up to her what she did about it but given I had been speaking to her bank about her financial affairs I could not very well go behind their back and assist her in evading her responsibiliies.

She became abusive and I asked her to leave. She continued to be abusive and Carol-Ann pointed out to her that we had actually paid her far more than she was due and that if we had paid her only for the weeks she had worked and deducted the loan that I had given her that she would have been left with practically nothing. Fiona retorted angrily that she wanted something for "solatium".

I asked her to leave again and as she got out to the street she turned round and started to shout at me as there were quite a number of people passing and no doubt she wanted to cause me maximum embarrassment. She shouted at the top of her voice on quite a number of occasions that I was nothing but a "psychotic tart". She also shouted "If Jimmy marries you he'll be sorry". I said to her she was doing herself no favours acting in this way and told her not to come near the office again.

6

EXHIBIT 1
Page 21

I contacted Bill Macreath of Levy & McRae who she had said was acting on her behalf. Bill Macreath advised me that she had telephoned him from a phone box and that the conversation had lasted less than 40 seconds and he had told her that they were not interested in acting for her and that they did not do any Legal Aid work. Bill told me that his only prior involvement with Fiona was that an Advocate friend of his had asked him to speak to a potential Trainee who was having difficulty finding employment and that he had spoken to her for about 20 minutes but there was never any question of him offering her a job. He reiterated to me that they were certainly not acting on her behalf and had no intention of doing so.

I wrote out to Fiona on 28th October, 1997.

Again I was told she had been seen that afternoon circling the office in her car.

Wednesday, 29th October, 1997

I was in the office in Glasgow in the morning and then went across to Edinburgh for a meeting in the afternoon. Around 4.30 p.m. when I was on a train coming back from Edinburgh I was contacted by Ross Pilkington who said that Peter McCann, who is one of our correspondents for the Edinburgh Office, had been on the telephone and was very upset because Fiona Muir had telephoned him. Apparently she had said that we in the office disliked Peter and had made disparaging remarks about him, all of which was completely untrue. She also apparently had the cheek to go on and mention to him some incident from years before involving Arabian swords and was apparently critical of him! He set the record straight in his own inimitable fashion but he telephoned Ross to express his surprise that these comments were being made and Ross reassured him that this was nonsense and gave him some of the background. Peter also warned Ross that he should be careful for his own safety because some of the comments made by her about Ross were of a threatening nature.

I immediately organised for the office to send a FAX from myself to Peter apologising for Fiona's behaviour and saying that I would telephone him.

The decorator who is working in the office saw Fiona circling the office in her car late that afternoon and she apparently waived at him and then ducked her head.

Thursday, 30th October, 1997

I telephoned Peter McCann to apologise for what had happened and to reassure him that there was no truth in the allegations being made. Peter reiterated to me concerns about Ross's safety given what had been said to him by Fiona, and also said that if she turned up at his office she would be shown the door immediately. I mentioned to him that Fiona had described Peter's associate Terry Ruddie as a "close personal friend" of her's and Peter told

7

EXHIBIT 1
Page 22

me that when he had mentioned this friendship to Terry he had blanched and said that he hardly knew her!

Then in the lunchtime mail I received a letter dated 29th October, 1997 from Fiona which is highly defamatory of myself and the firm. The contents are nonsense. She claims once again that Levy & McRae are acting on her behalf and says in it that she is sending copies of this letter to Donald Dewar and Norman Godman MP. It should be pointed out at this stage that Fiona told us that she was a delegate to Donald Dewar's constituency and she regularly reported in the few weeks she was with us that she had been on the telephone to "Donald" the previous evening and had given him advice on certain matters.

END

8

EXHIBIT 1
Page 23